SOUTHWEST ENERGY CORPORATION, Petitioner, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Fourth District    No. 4—94—0759

Argued July 18, 1995.—Opinion filed September 7, 1995.

Val C. Simhauser (argued), of Simhauser Law Office, of Springfield, for petitioner.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Jerald S. Post, Assistant Attorney General (argued), of counsel), for respondent Pollution Control Board.

George Mueller (argued), of Hoffman, Mueller & Creedon, of Ottawa, and Ricca C. Slone, of Peoria, for respondent Concerned Citizens for a Better Environment.

JUSTICE GARMAN delivered the opinion of the court:

Southwest Energy Corporation (Southwest) obtained local siting approval from the City of Havana (Havana) for a waste-to-energy incinerator. A citizen's group, Concerned Citizens for a Better Environment (Concerned Citizens), appealed Havana's decision to the Illinois Pollution Control Board (Board). The Board reversed Havana's siting approval based upon a lack of fundamental fairness in Havana's hearing process. (*Concerned Citizens for a Better Environment v. City of Havana* (May 19, 1994), Ill. PCB Op. 94-44.) Southwest now appeals. We affirm.

Southwest, owned by John Kirby, filed its application for local siting approval with Havana on July 9, 1993. Concerned Citizens appeared by counsel on September 29, 1993. Havana hired a hearing officer and held three days of hearings on October 26, 27, and November 2, 1993. After the siting hearing, Christine Zeman, the hearing officer, submitted a report to the Havana city council (council) recommending findings of fact and conclusions of law. On December 21,

1993, the council granted local siting approval by passing Ordinance 986, which adopted Zeman's report by reference and incorporation. Concerned Citizens appealed Havana's decision to the Board. The Board held a hearing on April 6, 1994, which gathered the following information.

On September 16, 1993, the local chamber of commerce sponsored a luncheon with Pat Mahoney, who would speak about the proposed incinerator. Mahoney is the president of Energy Answers Corporation (Energy Answers), which would build the incinerator. There were approximately 75 people at the meeting. An opponent to the incinerator testified that a Havana city policeman prevented her from attending the meeting. She was told that no one would be admitted to the meeting unless he or she had an invitation. Five council members and Mayor Allen McNeil attended the meeting. McNeil did not request the police to be present, and he did not recall that a police officer was stationed outside the meeting room. McNeil knew there were objectors to the incinerator outside the meeting room, but he did not know anyone had been denied entrance to the building.

In October 1993, five council members, McNeil, the owners and publishers of the local newspaper, the president of the chamber of commerce, and Kirby, among others, toured an incinerator (SEMASS) in Massachusetts that was operated by Energy Answers. All council members were invited to take the tour. The week prior to the tour, three council members decided not to go. The council replaced them by informal consensus. Only people in favor of the incinerator participated, although they unsuccessfully attempted to include the three council members who were opposed to the incinerator.

The trip participants flew to Providence, Rhode Island, on Friday and returned on Sunday. Kirby paid for the airfare, motel accommodations, and dinners on Friday and Saturday nights. The participants paid for their other meals. Kirby and SEMASS employees joined them for dinner on Friday night, but the SEMASS plant was not discussed. The participants toured the SEMASS plant on Saturday. They were divided into groups and given tours by SEMASS employees. The tours began at 10 a.m. and lasted two to five hours. The participants were allowed to ask anyone in the plant any question. They had lunch at the SEMASS plant. Several participants were given literature. In addition, some participants saw operating permits and records of emissions tests, but no one saw a complaint history of the plant. Kirby and SEMASS employees ate dinner with the participants on Saturday night, but the SEMASS plant was not discussed. The participants went sight-seeing on Sunday. They talked to local residents regarding the plant and its impact on the surround-

ing area, and the local residents made no negative comments regarding the SEMASS plant.

The council members had a favorable impression of the SEMASS plant after the tour. The SEMASS tour gave them an idea regarding what the proposed Havana incinerator would look like. Council members stated their votes were based upon the siting hearing and not what they saw on the SEMASS tour.

Zeman, an attorney in private practice in Springfield, acted as the siting hearing officer on behalf of Havana. After Southwest filed its application for siting approval, McNeil met with Zeman to see if she would be interested in serving as hearing officer and developing a siting ordinance to establish procedural rules for the siting proceedings. They were joined by Kirby. Zeman learned during the luncheon that Kirby was the principal person behind the application. McNeil and Kirby met with Zeman to see if she was familiar with section 39.2 of the Environmental Protection Act (Act) (415 ILCS 5/39.2 (West 1992)) and the siting approval process in general. Both McNeil and Kirby participated in determining Zeman's qualifications.

Zeman subsequently contacted Kirby on several occasions. She spoke with Kirby seven times by telephone. Zeman's billing records, which were admitted into evidence, show phone calls to discuss "PROCEDURE," "ORDINANCE REVIEW," and "CRITIQU[E OF] ORDINANCE." Her records also show she "REVISE[D] ORDINANCE PER KIRBY'S COMMENTS," "REVIEW[ED] KIRBY COMMENTS/FAX," conferred with Kirby by phone "TO OKAY LATEST CHANGE" to the ordinance, and "FAX[ED] DOCUMENT TO KIRBY *** FOR REVIEW; [CONFERRED WITH KIRBY BY PHONE] AS TO NOTICE MODIFICATIONS; *** REVISE[D] NOTICE PER COMMENTS." According to Zeman, one phone call involved a draft of the notice, which had been sent to Kirby to insure that all the information was accurate. Kirby made two corrections: one concerned the address of the landowner and the other involved the actual terminology for location of the facility. Zeman had no contacts with Kirby during the hearings.

Zeman's fee agreement is also a matter of contention among the parties. It was signed by Zeman, McNeil (on behalf of Havana), and Kirby (on behalf of Southwest). The agreement required Southwest to forward payment of Zeman's bill directly to her. At one point Zeman sent Kirby a letter dated February 15, 1994, asking him to pay her fees. The letter states in part:

> "The partners of this firm have expressed concern with the growing balance Southwest Energy owes for the legal services I've rendered on behalf of [Havana] and you. ***

Mayor McNeil has indicated you were satisfied with my services and certainly Southwest is the primary beneficiary of the services I rendered. When we last spoke[,] you indicated you would be sending payment prior to commencement of the appeal."

It is possible that Zeman misunderstood who she was representing. Her testimony reveals confusion, at best, regarding whether both Southwest and Havana were her clients; possibly, she thought Southwest was her client. Zeman stated that no contact with McNeil, the council, or Kirby caused her to prejudge or be predisposed regarding how she would rule during the proceedings.

Based upon the evidence gathered at the hearing, the Board determined the siting proceedings were tainted by extensive, improper contact between Southwest and the council as a result of (1) the contacts between Zeman and Kirby, including the fee agreement; (2) the council's trip to the SEMASS plant; and (3) the luncheon which Energy Answers and the council attended but where the general public was not allowed. The Board stated the combination of these contacts led to the conclusion the siting proceedings did not comport with the standards for an adjudicatory proceeding and were fundamentally unfair.

Specifically, the Board found the trip to the SEMASS plant to be improper. It found Southwest's sponsorship and payment for a tour of a facility used as the model for the proposed facility, which included the council but not the general public, led to a fundamentally unfair proceeding. The Board stated the opponents of the incinerator were prejudiced because they were without the benefit of viewing the model site and were unable to appropriately address the impressions formed by the council members touring the SEMASS plant. The Board also found the council members were properly allowed to participate in the siting process and any predisposition did not result in a fundamentally unfair proceeding.

In addition, the Board found Zeman did not exhibit bias in the proceedings. However, it stated that the issue was not whether Zeman exhibited bias, but whether the siting proceedings were fundamentally unfair. The Board found that under the circumstances of the case, the relationship between Zeman, Havana, and Southwest created "inherent bias." The Board could find no statutory basis for the fee agreement between Southwest and Zeman, stating the Act requires Havana to pay Zeman and then recoup the expense from Southwest. The Board noted the contacts between Kirby and Zeman show a continued disregard by Havana and Southwest for the adjudicatory process. McNeil brought Kirby to the initial discussions regarding Zeman's employment and allowed Kirby to participate in

determining Zeman's qualifications. The Board stated Zeman's fee agreement required Southwest to pay Zeman directly and granted Southwest the right to terminate Zeman. In addition, Zeman allowed Kirby to review the siting ordinance which governed the siting procedures. The Board concluded that Havana allowed Kirby control over Zeman and her actions which was outside the adjudicatory process.

We first note that any party adversely affected by a decision of the Board may seek review of that decision by the appellate court. (415 ILCS 5/41 (West 1992).) The Supreme Court of Illinois has established the appropriate standard of review for the Board's decisions:

> "The Act provides that judicial review of the Board's decisions be in accordance with the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1992)). (415 ILCS 5/41(a) (West 1992).) The Administrative Review Law provides that our review extends to all questions of law and fact presented by the entire record. (735 ILCS 5/3—110 (West 1992).) The rule that an administrative agency's findings of fact should not be disturbed unless they are against the manifest weight of the evidence does not apply where the question involved is one of law, such as the proper interpretation of a statute. Rather, in such a case, the Board's finding is not binding on the court." (*Envirite Corp. v. Illinois Environmental Protection Agency* (1994), 158 Ill. 2d 210, 214, 632 N.E.2d 1035, 1037.)

The Board's findings of fact will be reviewed to determine whether they are against the manifest weight of the evidence. However, most facts in this appeal are undisputed, and the Board determined the legal effect of those undisputed facts. We therefore exercise independent review of those determinations.

■ Section 39.2 of the Act permits the local governing body to grant local siting approval only if the proposed facility meets the nine criteria listed in that section. (415 ILCS 5/39.2 (West 1992).) Several courts have stated that local governing bodies engage in an adjudicatory function when they make siting determinations. (See *Land & Lakes Co. v. Pollution Control Board* (1993), 245 Ill. App. 3d 631, 638, 616 N.E.2d 349, 354.) When a local siting decision is appealed to the Board, section 40.1 of the Act requires the Board to consider the fundamental fairness of the procedures used by the local governing body. 415 ILCS 5/40.1 (West 1992).

Southwest argues the SEMASS trip, contacts with Zeman, and the luncheon did not make the siting proceedings fundamentally unfair. We first denote the local governing body's role in a siting

proceeding, the nature of such a proceeding, and the concept of fundamental fairness as it relates to a siting proceeding and the local governing body's role therein. The idea propounded by some courts that siting proceedings are adjudicatory in nature arises from section 39.2 of the Act. As noted above, that section requires the local governing body to determine whether nine statutory criteria have been established by the applicant. The local governing body cannot grant local siting approval unless the nine criteria are met. Furthermore, the local governing body has no discretion in the matter; it cannot exercise its traditional legislative-type discretion and grant siting approval based upon the perceived best interests of the community if the nine criteria have not been met.

■ Although the nine statutory criteria must be satisfied before local siting approval can be granted, section 39.2 of the Act does not state these are the only factors which may be considered. (*Fairview Area Citizens Taskforce v. Pollution Control Board* (1990), 198 Ill. App. 3d 541, 547, 555 N.E.2d 1178, 1182 (a third district case decided by a panel of this court).) Thus, a local governing body may find the applicant has met the statutory criteria and properly deny the application based upon legislative-type considerations.

Although a local siting proceeding more closely resembles an adjudicatory proceeding than a legislative one, the local governing body is not held to the same standards as a judicial body. Illinois courts and the General Assembly have recognized this point. For example, we note that in 1992, the legislature amended section 39.2 of the Act (Pub. Act 87—1152, § 1, eff. January 1, 1993 (1992 Ill. Laws 3136, 3138)) to add *only one sentence* to that section, as follows:

> "The fact that a member of the county board or governing body of the municipality has publicly expressed an opinion on an issue related to a site review proceeding shall not preclude the member from taking part in the proceeding and voting on the issue." (415 ILCS 5/39.2(d) (West Supp. 1993).)

The timing of this amendment and the fact that the legislature thought it necessary to amend this comprehensive section by adding just one sentence suggest that the General Assembly was concerned about arguments that had been recently made to the appellate court asserting claims of procedural unfairness. One such argument was that a village board was prejudiced because of a "predisposition" to rule against the appellants because the village board members believed the landfill in question would provide an economic benefit to the community (see *Fairview Area*, 198 Ill. App. 3d at 546, 555 N.E.2d at 1181); another was that a county board was prejudiced against appellants because of *ex parte* contacts county board members had with

opponents of a proposed landfill. See *City of Rockford v. County of Winnebago* (1989), 186 Ill. App. 3d 303, 313-14, 542 N.E.2d 423, 430-31.

We construe the sentence added by Public Act 87—1152 as demonstrating the General Assembly's understanding that it has called upon locally elected officeholders on municipal or county boards—not judges—to adjudicate whether the siting criteria set forth in section 39.2(a) of the Act (415 ILCS 5/39.2(a) (West 1992)) are present in a given case. In that amendment, the legislature recognized that standards governing judicial behavior cannot and do not apply to such local officeholders.

■ We also note that the Supreme Court of Illinois has specifically rejected the argument that an inherent bias is created when an administrative body is charged with both investigatory and adjudicatory functions. (See *E&E Hauling, Inc. v. Pollution Control Board* (1985), 107 Ill. 2d 33, 43, 481 N.E.2d 664, 668; see also *Citizens Against Regional Landfill v. Pollution Control Board* (1994), 255 Ill. App. 3d 903, 908, 627 N.E.2d 682, 685.) On this point, we agree with the views expressed by J. Theodore Meyer in his concurring opinion for the Board in this case:

> "I believe that the application of standards of adjudicatory decisionmaking, rather than legislative standards, is unfair to local decisionmakers. Local elected officials are almost always asked to wear a legislative 'hat' when taking official actions. To ask elected officials to put on an adjudicatory 'hat' and act like judges when reviewing a siting application places an unnecessary burden on both the individual decisionmaker and on the siting process."

*Ex parte* contacts between the public and its elected representatives are inevitable. One court upheld the integrity of a siting proceeding although several members of the county board received a petition, letters, personal contacts, and telephone calls from constituents expressing opposition to a landfill application. *Waste Management of Illinois, Inc. v. Pollution Control Board* (1988), 175 Ill. App. 3d 1023, 1043, 530 N.E.2d 682, 697-98.

■ Furthermore, siting proceedings are not entitled to the same procedural protection as more conventional adjudicatory proceedings. Although citizens before a city council in siting proceedings may insist the procedure comport with standards of fundamental fairness, they are not entitled to a fair hearing by reason of the constitutional guarantees of due process. (*Tate v. Pollution Control Board* (1989), 188 Ill. App. 3d 994, 1019, 544 N.E.2d 1176, 1193.) Parties before a local governing body in a siting proceeding must be given the opportunity to present evidence and object to evidence pre-

sented, but they need not be given the opportunity to cross-examine opposing parties' witnesses. This point is also recognized by the General Assembly. Section 39.2(c) of the Act requires the local governing body to consider any written comment filed within 30 days of the last public hearing. (415 ILCS 5/39.2(c) (West 1992).) Obviously, the parties cannot cross-examine those who submit written comments.

We now turn to the specific facts of this appeal. Southwest claims the Board erred in ruling the SEMASS trip was not fundamentally fair because (1) the law permits such trips; (2) a tour has only marginal relevance to the issue of site approval; and (3) there was no showing that the trip and tour prejudiced the incinerator opponents, tainted the siting procedures, or biased the council members who later voted in favor of granting siting approval.

Southwest relies upon *Tate*, a decision by this court, to support its position that the law permits the local governing body to tour comparable facilities. *Tate* involved siting approval for an existing landfill. A seven-member committee of the county board took a formal 40-minute tour of the existing landfill, accompanied by an opponent to the landfill and the site operator. (*Tate*, 188 Ill. App. 3d at 997, 544 N.E.2d at 1179.) This court affirmed the Board's siting approval. However, the committee's trip to the landfill was not an issue and was not discussed by this court. Nevertheless, Southwest asserts that *Tate* implicitly approved such tours. Southwest claims it would be impractical to invite both the deciding body and the general public on a tour of a comparable facility because the expense would bankrupt the proponent or the local government and a large number of people visiting the site would create chaos. Southwest urges this court to establish guidelines for tours of comparable facilities in siting cases.

The Board correctly determined the SEMASS plant tour was not fundamentally fair. Southwest effectively denied opponents of the incinerator knowledge of information which the trip participants obtained. Even if opponents could have taken a tour of the SEMASS plant at a later date as Southwest claims, there is no guarantee they would have been exposed to the same information as the council. This hindered preparation of the opponents' case against the incinerator. We note this determination does not depend upon the opponents' right to cross-examine the trip participants about the SEMASS tour. As noted above, fundamental fairness in a siting proceeding does not include cross-examination.

A local governing body may tour an existing facility without violating the fundamental fairness required by the Act. Such a trip allows city council members to see the facility in operation and to

picture the facility in their own locality. We do not deprive local governing bodies of this essential information; indeed, we encourage such trips. Fundamental fairness merely requires that representatives of all parties to the siting proceeding be given an opportunity to accompany the local governing body when it takes such a tour. If a party declines to send a representative on the tour, then the local governing body and remaining parties may tour the facility. In addition, it is proper for the applicant to ultimately pay reasonable expenses of the tour. If this financial burden is placed upon the local government or the participants, it will discourage these beneficial tours. Section 39.2(k) of the Act permits a local governing body to charge an applicant a reasonable fee to cover the reasonable and necessary costs incurred in the siting review process. (415 ILCS 5/39.2(k) (West 1992).) The appropriate procedure would be for the local governing body to pay expenses of the tour and be reimbursed by the applicant.

We do not find persuasive Southwest's analogy to a juror who, on his or her own initiative, visits a site where a disputed traffic accident occurred. We agree with the respondents that the analogy would be applicable only if one of the parties involved took a majority of the jury with it, without the opponent, explaining its version of the accident. No opponents were invited to take the SEMASS tour, although the Concerned Citizens filed an appearance prior to the tour. Three council members who voted not to grant siting approval were invited and declined to participate; but they are members of the deciding body, not parties opposed to the incinerator.

Southwest also claims the SEMASS tour had only marginal relevance to the issue of site approval because the Board is responsible for approving the incinerator's location, not the incinerator's design. Southwest notes that although section 39.2(a)(ii) of the Act required the council to find "the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected" (415 ILCS 5/39.2(a)(ii) (West 1992)), it claims this language only requires the council to determine whether the proposed incinerator will "fit" with its surroundings.

■ We find no merit in Southwest's argument. It is difficult to believe that Southwest would have paid for the SEMASS plant tour unless it was relevant or Southwest intended to influence the council members. In addition, Southwest's argument supports the position it opposes. If, as Southwest argues (we do not decide this point), the Act requires the council to merely determine the incinerator's location or "fit," then the trip was highly relevant. The council members who toured the SEMASS plant stated the tour gave them an idea regard-

ing how the proposed incinerator would "fit" with its surroundings in Havana.

Southwest also claims the SEMASS tour did not make the proceedings fundamentally unfair because there was no showing that the trip and tour prejudiced the incinerator opponents, tainted the siting procedures, or biased the council members who later voted in favor of granting siting approval. We need not address this argument. As stated above, we determined the trip was fundamentally unfair because the incinerator opponents were not given equal access to information obtained by the council members. It is irrelevant to that decision whether the tour caused the council members to prejudge the siting application.

Southwest next argues the direct contact and relationship, including Zeman's fee agreement, between Zeman, Southwest, and Havana did not render the siting proceeding fundamentally unfair. Southwest argues that since Zeman did not have a vote, her alleged predisposition is irrelevant. In *Fairview*, the Fairview village board retained an expert to evaluate a proposed landfill. The expert met with the applicant in the presence of the village attorney. He also had other conversations with a subsidiary of the applicant's parent corporation. The expert later reported to the village board regarding the landfill. On appeal, the objectors claimed the expert's *ex parte* contacts with the applicant made the proceedings fundamentally unfair. The court disregarded this contention, noting the expert's alleged predisposition was not relevant since he did not have a vote. *Fairview*, 198 Ill. App. 3d at 548, 555 N.E.2d at 1182.

In *Citizens Against Regional Landfill v. Pollution Control Board* (1994), 255 Ill. App. 3d 903, 627 N.E.2d 682, the court decided an issue similar to the one in *Fairview*. The county board denied an application for a landfill. On appeal, the applicant argued the proceedings before the county board were not fundamentally fair because the special assistant to the State's Attorney served as hearing officer in the case. The applicant argued the hearing officer had divided loyalties because he was responsible for conducting the siting proceedings fairly and, as special assistant to the State's Attorney, he was accountable to citizens of the community in matters concerning the landfill, including negotiating the landfill contract on behalf of the county. The court noted the hearing officer was not a decision maker in the siting proceedings and he did not recommend findings of fact to the county board. The court also noted the applicant did not identify any prejudicial conduct by the hearing officer. The court stated the hearing officer was not relevant to the issue of fundamental fairness because he did not vote regarding whether the site applica-

tion was to be granted. *Citizens*, 255 Ill. App. 3d at 907-08, 627 N.E.2d at 685.

■ Zeman did not vote regarding whether the site application was to be granted, and the Board found Zeman was not actually biased. Nevertheless, we affirm the Board's decision on this issue. The fee agreement contravened the Act and the proceedings were fundamentally unfair because the contacts between Zeman and Kirby created inherent bias in the proceedings. First, section 39.2(k) of the Act permits a local governing body to charge an applicant a reasonable fee to cover the reasonable and necessary costs incurred in the siting review process. (415 ILCS 5/39.2(k) (West 1992).) Under this section of the Act, the appropriate procedure would be for the local governing body to pay the attorney fees and be reimbursed by the applicant. In this case, Southwest paid the attorney fees directly to Zeman. This was improper under the Act.

Second, Zeman's testimony reveals she was confused regarding whether Southwest was also her client. Kirby participated in the initial meeting with Zeman and aided in determining whether she was qualified to be the hearing officer. Such contact is inherently fundamentally unfair; it is fraught with possibilities for actual prejudice. It could have given Zeman the impression that Southwest was her client. In addition, the fee agreement, which required Southwest to pay the attorney fees directly to Zeman's firm, inherently biased the siting proceedings. The fee agreement could also have given Zeman the impression that Southwest was her client. Southwest argues the Board should have considered only the written fee agreement and not Zeman's testimony concerning what she thought were the terms of the fee agreement. We disagree. The Board properly considered Zeman's testimony since Zeman would act in conformity with what she considered to be the terms of the fee agreement and not its actual terms. The fee agreement could also have given Southwest some influence over Zeman, even if she had realized Southwest was not her client, because Southwest could have delayed payment or disputed the amount of fees if it was displeased with Zeman. The later contacts between Zeman and Kirby were also fundamentally unfair in light of Zeman's confusion. She would be more deferential to Kirby's suggestions if she considered Southwest to be her client. However, we would not normally consider it to be improper for a party to review an ordinance governing siting procedures or a hearing notice for those proceedings, provided all parties of record are given an opportunity to do so and all comments are on the record.

■ Last, Southwest argues that it was not fundamentally unfair

for Energy Answers to attend a luncheon where Energy Answers and council members attended but the general public was not allowed. We agree. At the time of the luncheon, no opponents had made an appearance, so it would have been impossible to include them in the luncheon. Nevertheless, the SEMASS plant tour and Zeman's contacts with Kirby made the siting proceedings fundamentally unfair; therefore, the decision of the Board is affirmed.

Affirmed.

KNECHT, P.J., and STEIGMANN, J., concur.