LAND AND LAKES COMPANY, Petitioner, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.—SIERRA CLUB *et al.*, Petitioners, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Third District   Nos. 3—99—0689, 3—99—0819 cons.

Opinion filed December 28, 2000.

Elizabeth S. Harvey (argued) and Kristin Dvorsky-Tauras, both of McKenna, Storer, Rowe, White & Farrug, of Chicago, for petitioner Land and Lakes Company.

Albert F. Ettinger (argued), of Environmental Law & Policy Center of the Midwest, of Chicago, for other petitioners.

Charles F. Helsten, Robert C. Torbert, and Richard S. Porter (argued), all of Hinshaw & Culbertson, of Rockford, for respondent Will County Board.

Donald J. Moran (argued), of Pedersen & Houpt, of Chicago, for respondent Waste Management of Illinois, Inc.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Marcia L. McCormick (argued), Assistant Attorney General, of counsel), for respondent Pollution Control Board.

PRESIDING JUSTICE SLATER delivered the opinion of the court:

The Illinois Pollution Control Board (PCB) affirmed the decision of the Will County Board (County Board) to grant siting approval to Waste Management of Illinois, Inc. (WM), for the construction of a pollution control facility. Petitioners Land and Lakes Company (LALC) and Sierra Club, Audubon Council of Illinois, and Illinois Audubon Society (referred to hereinafter collectively as Sierra Club) seek review of the PCB's decision. In particular, petitioners contend that the proceedings before the County Board were fundamentally unfair and the County Board's decision is against the manifest weight of the evidence. For the reasons that follow, we affirm.

## STATUTORY BACKGROUND

■ Under the Illinois Environmental Protection Act (the Act) (415 ILCS 5/1 *et seq.* (West 1998)), a party seeking to develop a pollution control facility must first obtain approval of the site location from the appropriate local siting authority. 415 ILCS 5/39(c) (West 1998). If the

proposed site lies within an unincorporated area, the appropriate local siting authority is the county board for the county where the facility is to be located. 415 ILCS 5/39(c) (West 1998). A developer who obtains approval from the local siting authority must still obtain the permission of the Illinois Environmental Protection Agency in order to construct and operate the facility. 415 ILCS 5/39(c) (West 1998).

An applicant seeking siting approval must submit sufficient details of the proposed facility demonstrating that it meets each of nine criteria. 415 ILCS 5/39.2(a) (West 1998). The local siting authority must hold at least one public hearing concerning the application. 415 ILCS 5/39.2(d) (West 1998). Any person may file written comment concerning the proposed facility and the local siting authority must consider any such comments received or postmarked no later than 30 days after the date of the last public hearing. 415 ILCS 5/39.2(c) (West 1998).

The decision of the local siting authority must be in writing and must specify the reasons for the decision. 415 ILCS 5/39.2(e) (West 1998). Any party, other than the applicant, who participated in the public hearing may petition the PCB to contest a local siting authority's decision to grant the application. 415 ILCS 5/40.1(b) (West 1998). In reviewing the decision, the PCB must consider the local siting authority's written decision, the transcript of the public hearing, and "the fundamental fairness of the procedures used by the [local siting authority] in reaching its decision." 415 ILCS 5/40.1(a) (West 1998). The decision of the PCB is directly appealable to this court. 415 ILCS 5/41 (West 1998); 155 Ill. 2d R. 335.

## FACTS

The case at bar involves a proposal to develop a solid waste landfill on the site of the former Joliet Army Ammunition Plant (the Arsenal). The Arsenal occupies an approximately 23,437-acre area of southern Will County. At various times beginning in the 1940s, the United States Army and its contractors have manufactured and tested ordnance and explosives on the site.

In 1996, Congress passed the Illinois Land Conservation Act of 1995 (Pub. L. No. 104—106, 110 Stat. 594 (1996)). Under this legislation, the Arsenal is to be converted to various nonmilitary uses, including the 19,000-acre Midewin National Tallgrass Prairie, a 982-acre national veterans cemetery, a 3,000-acre industrial park, and a 455-acre landfill to be owned by Will County. As a condition of the conveyance of the 455-acre parcel to Will County, the federal government "may use the landfill *** for the disposal of construction debris, refuse, and other materials related to any restoration and cleanup of Ar-

senal property" "subject to applicable environmental laws and at no cost to the [f]ederal [g]overnment." Pub. L. No. 104—106, § 2922(c), 110 Stat. 594, 605 (1996).

Subsequently, the County Board awarded WM a contract to design, construct, and operate a landfill on the Arsenal property. The County Board also awarded a contract to Engineering Solutions, Inc. (Engineering Solutions), to provide WM and Will County with advice concerning compliance with the Act's siting approval criteria.

The County Board then enacted the Will County Siting Ordinance for Pollution Control Facilities (the Siting Ordinance) (effective April 16, 1998). Under the Siting Ordinance, the pollution control facility committee (the Committee), a three-member committee of the County Board, hears the evidence presented at the public hearing. At the close of the public hearing and upon request of the Committee, county departments may submit reports and recommendations to the Committee. Based on the evidence at the public hearing, material submitted during the public comment period, and any reports received, the Committee determines whether the siting applicant has met the statutory criteria and makes its recommendation to the full County Board. The County Board then takes the final decision on the application.

In August 1998, WM filed its application to construct and operate a solid waste landfill to be known as the "Prairie View Recycling and Disposal Facility" (Prairie View). An eight-day public hearing on WM's application concluded on December 7, 1998. Several hearing participants filed memoranda during the subsequent public comment period. On the last day for public comment, WM submitted a reply memorandum along with several technical reports.

After the close of the public comment period, Dean Olson, the then director of the waste services division of the Will County land use department (Waste Services) submitted to the Committee a report entitled "Final Report and Recommendations of Will County to the Pollution Control Facility Committee Concerning the Prairie View RDF Siting Application" (the Olson Report). The report, prepared by Waste Services' staff, Engineering Solutions' employees, and Charles Helsten (a special Assistant State's attorney), recommends granting WM's application subject to 52 conditions.

The Committee adopted the findings and recommendations of the Olson Report as its recommendation to the County Board. After debating the matter, the County Board voted to grant WM's application. The County Board also adopted the findings of the Olson Report, but added 5 conditions to the 52 recommended in the report.

Petitioners appealed the County Board's decision to the PCB on grounds that the proceedings before the County Board had been

fundamentally unfair and that the decision to grant WM's application is contrary to the manifest weight of the evidence. The PCB held an evidentiary hearing concerning the fundamental fairness claim.

At the hearing, Christopher Rubak, a senior WM engineer, testified that he worked on the development of the Prairie View siting application. Rubak recalled that WM submitted a preliminary version of the application to Waste Services and Engineering Solutions. Waste Services' staff and Engineering Solutions' employees made handwritten comments on the draft application and returned it to WM. WM considered the comments. WM revised the draft application in response to some of the comments, but chose not to make any revisions with respect to others. WM had no contact with County Board members concerning the drafting of the application and had no contact with County Board members, Waste Services' staff, or Engineering Solutions' employees after WM filed its application. WM destroyed all preliminary drafts of the application.

The only other witness to testify was Charles Helsten, the special assistant State's Attorney who helped draft the Olson Report. Helsten identified a letter he had written to WM in April 1998 that advised WM to communicate with Waste Services through Donna Shehane, a Waste Services staff member, rather than through Director Dean Olson. In the letter, Helsten explains that this precaution is necessary because, due to his position, Olson must consult with the County Board. Helsten also testified that he cautioned Waste Services and other Will County departments that they should not communicate with County Board members concerning the Prairie View application.

The PCB affirmed the decision of the County Board. It is from this order that petitioners appeal.

## ANALYSIS

### Fundamental Fairness

On appeal, petitioners contend that the proceedings before the County Board were fundamentally unfair.

■ A nonapplicant who participates in a local pollution control facility siting hearing has no property interest at stake entitling him to the protection afforded by the constitutional guarantee of due process. *Southwest Energy Corp. v. Pollution Control Board*, 275 Ill. App. 3d 84, 655 N.E.2d 304 (1995). However, under section 40.1 of the Act (415 ILCS 5/40.1 (West 1998)), such a party has a statutory right to "fundamental fairness" in the proceedings before the local siting authority. *Southwest Energy Corp.*, 275 Ill. App. 3d 84, 655 N.E.2d 304. A local siting authority's role in the siting approval process is both quasi-legislative and quasi-adjudicative. See *Southwest Energy*

*Corp.*, 275 Ill. App. 3d 84, 655 N.E.2d 304. In recognition of this dual role, courts have interpreted the right to fundamental fairness as incorporating minimal standards of procedural due process, including the opportunity to be heard, the right to cross-examine adverse witnesses, and impartial rulings on the evidence. *Daly v. Pollution Control Board*, 264 Ill. App. 3d 968, 637 N.E.2d 1153 (1994).

In order to determine whether the proceedings at issue were fundamentally fair, we must first ascertain the appropriate standard of review. An administrative agency's determinations of fact will not be disturbed unless contrary to the manifest weight of the evidence, *i.e.*, where the opposite conclusion is clearly evident. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 606 N.E.2d 1111 (1992). With respect to questions of law, an administrative agency's determinations are subject to *de novo* review. *Branson v. Department of Revenue*, 168 Ill. 2d 247, 659 N.E.2d 961 (1995).

Where an agency determination presents a mixed question of law and fact, the agency decision will be set aside only if it is clearly erroneous. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 692 N.E.2d 295 (1998). The clearly erroneous standard is a middle ground between the deferential manifest weight of the evidence standard and the *de novo* standard. *City of Belvidere*, 181 Ill. 2d 191, 692 N.E.2d 295. Application of the clearly erroneous standard is intended to provide some deference to an administrative agency's experience and expertise. *City of Belvidere*, 181 Ill. 2d 191, 692 N.E.2d 295.

Generally, the PCB must confine itself to the record developed by the local siting authority. 415 ILCS 5/40.1(a) (West 1998). However, in some cases, such as the one at bar, it is proper for the PCB to hear new evidence relevant to the fundamental fairness of the proceedings where such evidence necessarily lies outside of the record. See *E&E Hauling, Inc. v. Pollution Control Board*, 116 Ill. App. 3d 586, 451 N.E.2d 555 (1983), *aff'd*, 107 Ill. 2d 33, 481 N.E.2d 664 (1985). Clearly, the PCB's findings of fact based on such evidence are entitled to the deference provided by the manifest weight of the evidence standard.

Here, however, the parties do not dispute the facts related to the fundamental fairness of the proceedings before the County Board. Instead, the parties disagree as to what fundamental fairness requires and whether the proceedings at issue meet that standard. The former inquiry is a question of law subject to *de novo* review. The latter inquiry may be characterized as a mixed question of law and fact because it "involves an examination of the legal effect of a given set of facts." *City of Belvidere*, 181 Ill. 2d at 205, 692 N.E.2d at 302. Nevertheless, we hold that the PCB's determination that the proceedings were fundamentally fair is subject to *de novo* review.

The rationale for applying the clearly erroneous standard to agency determinations on mixed questions is to provide some deference to the agency's peculiar experience and expertise. The fundamental fairness of quasi-adjudicative proceedings is outside the scope of any experience or expertise specific to the PCB. Indeed, it is arguable that this court has superior experience and expertise in evaluating this matter. Accordingly, deference to the PCB is not warranted under the circumstances of this case and our review of the fundamental fairness of the proceedings before the County Board is *de novo*.

Having determined the appropriate standard of review, we turn our consideration to petitioners' claims related to fundamental fairness. LALC claims that the extensive review of, and comment upon, WM's siting application made by Waste Services and Engineering Solutions prior to the filing of the application rendered the siting approval process fundamentally unfair.

LALC insists that it is not alleging that the process was unfair due to *ex parte* contacts or the County Board's prejudgment of adjudicative facts. Instead, LALC argues, the guidance WM received from its consultations with Waste Services and Engineering Solutions in honing its application rendered the subsequent proceedings "virtually meaningless" and shifted the burden of proof to siting approval opponents. LALC characterizes Waste Services' staff as a "quasi-decisionmaker" and thereby discounts the fact that there is no evidence that the County Board had any contact with WM, Waste Services, or Engineering Solutions regarding the development of WM's application.

The sole support for the contention that Waste Services' staff is a "quasi-decisionmaker" is the County Board's decision to adopt the findings and recommendation of the Olson Report as its written decision. We do not consider this sufficient evidence to show that the County Board delegated its decisionmaking responsibility to its staff. Nothing in the record indicates that the County Board failed to exercise its own judgment when it adopted the Olson Report. In the absence of any prefiling collusion between the applicant and the actual decisionmaker, *i.e.*, the County Board, the prefiling contact between WM and Waste Services could not have deprived LALC, or any other siting approval opponent, of fundamental fairness. See *Fairview Area Citizens Taskforce v. Pollution Control Board*, 198 Ill. App. 3d 541, 555 N.E.2d 1178 (1990).

Sierra Club contends that the extensive preapplication consultation between WM and Waste Services, when coupled with the County Board's adoption of the Olson Report, rendered the siting approval process fundamentally unfair. In particular, Sierra Club maintains

that the County Board forfeited its neutrality by adopting the findings of its staff when that same staff aided WM in drafting its application. Sierra Club asserts that, just as it would be unacceptable for a clerk to provide legal assistance to a party and then assist a judge in ruling on a controversy involving that same party, it is fundamentally unfair for the County Board to rely on the ostensibly neutral Olson Report when that report was authored by persons who helped to draft the siting application.

Sierra Club's attempt to analogize the relationship between the County Board and its staff to the relationship between a judge and his clerk is misconceived. A local siting authority is not held to the same standard of impartiality as a judge. *Southwest Energy Corp.*, 275 Ill. App. 3d 84, 655 N.E.2d 304. Moreover, the decision of a local siting authority is not tainted merely because it adopts the findings and recommendations of persons who may have some bias concerning the merits of the siting application. So long as the local siting authority is aware of the possibility of bias, it is not improper for the authority to adopt findings and recommendations proffered by a person predisposed toward the siting application. Indeed, if it considers it proper, a local siting authority may adopt a set of findings proffered by an applicant or a siting approval opponent without depriving any party of fundamental fairness.

The County Board was aware that the Olson Report authors consulted with WM concerning the development of its application. After all, it was the County Board itself that mandated the consultation. Accordingly, we must presume that the County Board took into account the possibility that the authors of the Olson Report might be favorably predisposed toward WM's application, yet considered the Olson Report to be an accurate reflection of its own conclusions.

In addition, we do not agree with the Sierra Club's claim that the Olson Report constitutes expert opinion evidence improperly submitted after the close of the public comment period. Sierra Club bases its claim on: (1) a reference to the report as "expert opinion" made by Christine Zeman, an attorney who advised the County Board during its deliberations; and (2) the following excerpt from the report: "[b]ased on our knowledge and past experience with leachate characteristics of Illinois landfills, there is no reason to believe that the leachate from the proposed landfill will be significantly different in quality from other landfills in the area."

These references notwithstanding, the Olson Report is not expert opinion evidence. The report taken as a whole is a presentation of its authors' recommendations and a summary of the record developed during the public hearing and public comment period. Neither the

County Board attorney's mischaracterization of the report nor the authors' single, aberrant reference to their own experience is sufficient to transform the 27-page report into expert opinion evidence.

Likewise, we reject the Sierra Club's contention that the Olson Report improperly shifted the burden of proof to siting approval opponents. In support of its argument, the Sierra Club cites several statements contained in the report which note the lack of evidentiary support for the opinions of expert witnesses who testified on behalf of siting approval opponents. Rather than shift the burden of proof, these statements merely question the factual basis for the expert testimony.

Sierra Club also contends that the County Board improperly considered the Olson Report because the authors of the report relied on "unspecified documents" and approximately 2,000 pages of documents submitted by WM on the last day of the public comment period. The Olson Report contains a reference to "various other documents" and the phrase "includ[ing] (but not limited to)" serves as the introduction to a list of documents. It is not clear to what documents these phrases refer. However, neither is it clear that these phrases refer to any documents outside of the record. Accordingly, we cannot conclude that the County Board failed to confine itself to the record developed during the public hearing and public comment period.

With respect to the approximately 2,000 pages of material submitted by WM on the last day of the public comment period, these pages consist of a number of engineering and other technical reports addressing the geology and hydrology of the Prairie View site, federal government efforts concerning environmental remediation of the Arsenal property, and the suitability of the Prairie View site for landfill development. Joan Underwood, an expert witness who testified on behalf of WM, relied on some of the documents in her testimony before the County Board. In the Olson Report, several of the documents are listed and it is noted that they "lend credence and support to the opinions of those experts offered by [WM], and put into question the opinions of [experts offered by siting approval opponents]."

The documents in question were submitted within the 30-day public comment period. A party cannot cross-examine written material submitted as public comment. See *Southwest Energy Corp.*, 275 Ill. App. 3d at 93, 655 N.E.2d at 310. Moreover, the Act does not require that the public comment period be held open to allow parties to respond to materials submitted on the last day. Finally, Sierra Club has failed to demonstrate that any of these documents contain erroneous data or conclusions or how Sierra Club would have responded if it had had the opportunity. Indeed, in its brief, Sierra Club asserts that, in

some respects, the documents support its position. Therefore, even assuming that the County Board erred by considering the documents, any such error must be considered harmless.

We are also unpersuaded that the proceedings were fundamentally unfair because WM violated Will County's Siting Ordinance by submitting the documents on the last day of the public comment period. The Siting Ordinance provides, *inter alia*:

> "Any additional exhibits to be used by the applicant during the public hearing and not a part of the application shall be submitted at least twenty-four (24) hours prior to the commencement of the public hearing. Any additional exhibit used by the applicant, that in any way changes information provided with the application, or provides information not submitted as part of the application, shall be considered an amendment to the application and all sections of this [o]rdinance pertaining to amendments shall take effect." Will County Siting Ordinance for Pollution Control Facilities § 2 (eff. April 16, 1998).

Assuming that the County Board should have treated the documents as untimely exhibits to WM's application, Sierra Club, as noted previously, has not shown how the County Board's consideration of these documents is anything but harmless error.

In summary, siting approval opponents were afforded an opportunity to be heard, to cross-examine adverse witnesses, and to submit comments during the statutory period. Accordingly, we hold that the proceedings before the County Board were fundamentally fair.

## Sufficiency of the Evidence

LALC claims that WM provided insufficient evidence to meet criteria two and five of section 39.2(a) of the Act. Sierra Club maintains that the evidence was insufficient to support a finding of compliance with criteria two, three, and five.

■ As noted above, a party seeking siting approval for a pollution control facility must submit sufficient details of the proposed facility to meet each of nine statutory criteria. 415 ILCS 5/39.2(a) (West 1998). In the case *sub judice*, the criteria at issue require an applicant to show:

> "(ii) the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;
> (iii) the facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property;
> ***
> (v) the plan of operations for the facility is designed to minimize

the danger to the surrounding area from fire, spills, or other operational accidents[.]" 415 ILCS 5/39.2(a)(ii), (a)(iii), (a)(v) (West 1998).

■ A decision of a local siting authority with respect to an applicant's compliance with the statutory siting criteria will not be disturbed unless the decision is contrary to the manifest weight of the evidence. *Concerned Adjoining Owners v. Pollution Control Board*, 288 Ill. App. 3d 565, 680 N.E.2d 810 (1997). A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident, plain or indisputable. *Turlek v. Pollution Control Board*, 274 Ill. App. 3d 244, 653 N.E.2d 1288 (1995). Moreover, it is for the local siting authority to determine the credibility of witnesses, to resolve conflicts in the evidence, and to weigh the evidence presented. *Concerned Adjoining Owners*, 288 Ill. App. 3d 565, 680 N.E.2d 810.

■ With respect to criterion two, LALC contends that WM failed to design Prairie View to protect the public from the leachate generated by the ordnance and explosive waste Prairie View is obligated to accept from the former Arsenal. Although this waste may be more hazardous than ordinary municipal waste, there was no evidence that it is any more difficult to contain. Accordingly, it does not follow that such waste is incompatible with WM's proposed design.

For its part, Sierra Club asserts that WM failed to comply with criterion two because the opinions of its expert witnesses are based on a mistaken view of the geology and hydrology of the Prairie View site. In support of its argument, Sierra Club proffers the opinion of Roberta Jennings, who testified that WM's test data show that the geologic strata of the site contain "continuous permeable pathways" that would allow leachate to escape into the surrounding environment. Joan Underwood, an expert witness testifying for WM, acknowledged that WM's data showed the existence of permeable pathways but concluded that they were discontinuous.

The County Board, therefore, was confronted with competing expert interpretations of technical data. We cannot say, based on the record before us, that it is clearly evident that the County Board should have resolved this conflict in the evidence by crediting Jennings' interpretation over that of Underwood.

Similarly, we reject Sierra Club's claim that WM failed to meet its burden of proof because its groundwater assessment model and groundwater monitoring program are inadequate. These claims are based on interpretations and criticisms of technical data that conflict with interpretations put forward by WM expert witnesses. The County Board was in a far better position than this court to resolve this conflict. Accordingly, with respect to criterion two, the County Board's decision was not against the manifest weight of the evidence.

With respect to criterion three relating to the site's compatibility with surrounding property, Sierra Club's argument is limited to an assertion that WM failed to demonstrate that Prairie View would be compatible with the Midewin National Tallgrass Prairie (Midewin). Our review of the record, however, reveals that WM elicited testimony from its expert witnesses that Prairie View would not be incompatible with Midewin and that several other landfills are located in close proximity to forest preserves or parks. Thus, in the absence of any contrary evidence, the County Board's finding that WM satisfied criterion three is not manifestly erroneous.

Finally, we disagree with petitioners' assertion that WM failed to meet criterion five relating to operational accidents. WM presented a detailed and comprehensive plan to minimize the danger posed by operational accidents. Although the plan was not site-specific, it is not clearly evident that it is inadequate to address the potential dangers presented by Prairie View. Accordingly, we hold that the County Board's findings concerning criterion five and the other statutory criteria are not contrary to the manifest weight of the evidence.

## CONCLUSION

For the foregoing reasons, the decision of the Illinois Pollution Control Board is affirmed.

Affirmed.

BRESLIN and LYTTON, JJ., concur.