DIMENSIONS MEDICAL CENTER, LTD., *et al.*, Plaintiffs-Appellants, v. ELMHURST OUTPATIENT SURGERY CENTER, L.L.C., *et al.*, Defendants-Appellees.

Fourth District   No. 4—99—0030

Argued July 21, 1999.—Opinion filed September 29, 1999.

Andrew J. Creighton (argued), of Arlington Heights, for appellants.

Thomas C. Shields and Daniel J. Lawler (argued), both of Bell, Boyd & Lloyd, of Chicago, and Paul R. Welch, of Costigan & Wollrab, P.C., of Bloomington, for appellee Elmhurst Outpatient Surgery Center, L.L.C.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Karen J. Dimond, Assistant Attorney General, of counsel), for other appellees.

JUSTICE STEIGMANN delivered the opinion of the court:

In October 1997, defendant Illinois Health Facilities Planning Board (Board) issued a permit, known as a certificate of need (CON), to defendant Elmhurst Memorial Hospital (Memorial), a wholly owned subsidiary of defendant Elmhurst Memorial Health System, to build an outpatient facility to be called the Memorial Center for Health (Center for Health). The Board issued a second CON to Memorial jointly with defendant Elmhurst Outpatient Surgery Center, L.L.C.

(Surgery Center), a limited liability company owned by Memorial and several of its physicians, to build an ambulatory surgical treatment center (ASTC), which would provide outpatient surgery services inside the Center for Health.

Later that same month, plaintiffs, Dimensions Medical Center, Ltd. (Dimensions), Access Center for Health, Ltd., and Access Health Center, Ltd. (collectively Access), medical care providers operating existing ASTCs in the geographic area of Memorial's proposed facility, filed a complaint for administrative review in the circuit court, seeking reversal of the Board's decisions to issue the two CONs. In July 1998, intervenor, Northwest Community Health Center, Ltd. (Northwest), petitioned to intervene. (Northwest had previously applied unsuccessfully for a CON to operate an ASTC in the same geographic area as Memorial's proposed ASTC.)

In August 1998, the trial court conducted a hearing on Access and Dimensions' complaint and on Northwest's petition to intervene, granted Northwest's petition, and affirmed the Board's decision. Access, Dimensions, and Northwest appeal, arguing that (1) the administrative proceedings were unfair because (a) the hearing officer prohibited them from cross-examining witnesses, and (b) the Board allowed the applicants to provide additional materials in support of their CON applications after the close of the public hearing; and (2) the Board's decision was arbitrary, capricious, and against the manifest weight of the evidence. We affirm.

## I. BACKGROUND

Pursuant to section 3—106 of the Code of Civil Procedure (Code) (735 ILCS 5/3—106 (West 1996)), the Board filed the record of administrative proceedings as its answer to Access and Dimensions' complaint. That record consists of 7 volumes and nearly 2,500 pages of documentation. The evidence was nearly identical regarding the CON applications for the Center for Health and the ASTC, and the only reason two different CON applications were involved is because two different corporate entities applied for the CONs. None of these nuances are relevant to our analysis. Accordingly, our references to the evidence will relate to both applications unless otherwise stated. In addition, we will avoid unnecessary confusion by referring to both Memorial and the Surgery Center as Memorial.

In June 1997, Memorial filed applications for the Board to issue CONs for the two projects at issue—namely, the Center for Health and the ASTC. According to the application materials, Memorial's existing hospital facilities were aging and overcrowded, and Memorial wanted to modernize some of its outpatient services. Because of physical limi-

tations and zoning restrictions, Memorial could not accomplish these changes within the existing hospital structure, and adjacent land was not available.

Accordingly, Memorial sought to build the Center for Health approximately four miles from the hospital. Memorial planned the Center for Health to be a four-story facility housing the following: (1) an outpatient care center, to include (a) diagnostic radiology, (b) magnetic resonance imaging, (c) non-invasive diagnostic cardiology and cardiac rehabilitation, (d) physical and occupational therapy, (e) preadmission and preprocedure testing, and (f) specimen collection; (2) a regional blood bank; (3) leased space for private physicians' offices; and (4) the ASTC, which would offer a variety of outpatient surgical procedures, not to include pregnancy terminations. The Center for Health was projected to cost approximately $48 million, and the ASTC was projected to cost approximately $4 million.

The applicants provided the Board with a large amount of documentation in support of their claims that the new facility was necessary because (1) Memorial was currently serving more patients than its existing building could comfortably accommodate; (2) the design of Memorial's existing building was inadequate to provide outpatient care; and (3) Memorial's patients were currently receiving outpatient surgery in the hospital's traditional operating rooms, an inconvenient arrangement due to the layout of the hospital and the need to reschedule surgeries whenever an emergency need for an operating room arose.

Memorial also provided referral letters and statistics regarding the utilization of the hospital's existing facilities to demonstrate that Memorial's existing patients and doctors would use the new facility sufficiently for it to be economically feasible. In making these utilization estimates, Memorial did not propose to draw patients from other area facilities. In particular, Memorial based its ASTC utilization estimates on the number of outpatient surgeries it was currently performing in the hospital's operating rooms.

Dimensions and Access objected to Memorial's applications and demanded a public hearing. Pursuant to section 8 of the Illinois Health Facilities Planning Act (Planning Act) (20 ILCS 3960/8 (West 1996)), a hearing officer for the Illinois Department of Public Health (Department) conducted two hearings in July 1997 on the same day, one on each of the CON applications. After convening the first hearing, the hearing officer stated the following:

"Keep in mind, this is not a debate. If you feel that something is raised today that you take real issue with and you are lucky enough to follow the person that made that comment, obviously, [you can] indicate[ ] your disagreement.

But the best way to respond is to send me [comments] via [facsimile], because I will keep this record open until the close of business this Friday ***."

Memorial's president, Leo Fronza, was the first person to testify. Fronza introduced himself and then gave testimony substantially similar to the assertions in the application materials. When Fronza finished, no one asked to cross-examine him.

The city manager of Elmhurst, Tom Bochard, testified next and confirmed that "[i]t is doubtful that further development of the current hospital site will be allowed, and the [hospital's] current condition[al-]use permit prohibits any physician offices on the existing campus." Bochard indicated that the proposed location would avoid zoning problems, then concluded his testimony by saying, "I am pleased as a resident and pleased as a [c]ity manager, the community and hospital have been able to come together on a solution that fills the needs of everyone. I would encourage your approval of this project." No one asked to cross-examine Bochard. The next eight witnesses all spoke enthusiastically in favor of the proposed facility, and no one asked to cross-examine any of them.

The next witness was Allyson Bouldon, an attorney representing Dimensions, who read a prepared statement opposing Memorial's application. After Bouldon finished, the following exchange occurred between Memorial's attorney, Dan Lawler, and the hearing officer:

"MR. LAWLER: The rules under which this hearing may be conducted provide that any person shall have the right to be represented by counsel and may conduct reasonable questioning of persons who make relevant factual allegations.
***

HEARING OFFICER[ ]: As I indicated earlier, counselor, *** the format that I adhere to is nondebate, nonquestioning. I know what the rules indicate, but I have never offered an opportunity for cross[-]examin[ation] or re-examination at any of my hearings.

What I would recommend that you do is take advantage of the extension that's granted to file any factual information, to respond, to come back with a cross. But I will not allow a debate or a question-and-answer[,] period.

MR. LAWLER: The rules that the [Board] sent us with the notice of procedure—

HEARING OFFICER[ ]: I understand that. And my interpretation allows me to make that decision.
* * *

MR. LAWLER: But I will not have the opportunity to reasonably question this person.

HEARING OFFICER[ ]: You are absolutely correct.

\* \* \*

\*\*\* I think you're underestimating the intuitive process of the Planning Board. \*\*\*

MR. LAWLER: \*\*\* [I]t's not the intuitive process of the [Board] that concerns me. It's that the only material[s] that go up to the [c]ircuit [c]ourt \*\*\* is what our court reporter here is transcribing. And if I am not allowed to be heard—

HEARING OFFICER[ ]: What time limit are you talking? How detailed is your request for counsel going to be here?

MR. LAWLER: I would have approximately five minutes of questioning.

\* \* \*

HEARING OFFICER[ ]: You may—

MS. BOULDON [(the witness)]: If I could just interject, I believe I could possibly save everyone a lot of time. I prepared and submitted a written statement, and \*\*\* we are prepared and willing to respond to any inquiries in writing. That's for two reasons. To make sure we understand the inquiries, but also I am here in lieu of the attorney who usually represents the clients \*\*\*.

HEARING OFFICER[ ]: Any concern about that, counselor?

MR. LAWLER: Well, that's not what the rules allow.

HEARING OFFICER[ ]: I know that's not what the rules allow. I interpret the rules. I'm well aware of the interpretation I've made. \*\*\* You have an opportunity to question and to prepare written documentation.

MR. LAWLER: But I don't have a reasonable opportunity to question this person who's making irrelevant and factual allegations.

HEARING OFFICER[ ]: This person is also indicating that [she's] not the proper counsel to ask those questions.

MR. LAWLER: Well, then she shouldn't have been testifying.

HEARING OFFICER[ ]: She didn't testify. She offered information on the project.

\*\*\*

MS. BOULDON: I read from a prepared statement verbatim. The statement has been submitted to the record.

MR. LAWLER: Well,—

HEARING OFFICER[ ]: Counselor, as far as I'm concerned, you're starting to try my patience. If you have a problem with my ruling, you may certainly appeal it. Okay?"

At that point, Lawler requested and received permission to enter a statement into the record in response to Bouldon's testimony. When he finished, no one asked to cross-examine him.

Heather Lesson, an attorney representing Access, testified next in opposition to Memorial's application. When she had finished, the following exchange occurred between Lawler and the hearing officer:

"MR. LAWLER: *** I just want to preserve the record on the objection for the record. I didn't stand up to question the witness, but if I would have had the opportunity, I would have. I just want to make that clear. I'm assuming you would not have let me.

HEARING OFFICER[ ]: You're absolutely correct.

MR. LAWLER: Nor any other opponents?

HEARING OFFICER STEVENS: Nor any other individuals. There's no cross[-]examination, no rebuttal."

After that exchange, the final witness at the first hearing spoke in favor of the project. No one asked to cross-examine her.

At the second hearing, conducted later the same day, only two witnesses spoke in favor of the application, and no one asked to cross-examine either of them. Attorneys for Access and Dimensions gave statements in opposition to the project, and George Olson, the administrator for Oakbrook Medical and Surgical Center, also testified in opposition to the project. Olson was the final witness.

No party ever contested the core assertions of Memorial's application—namely, that the facility was needed because Memorial's patient base had outgrown the existing facility, which could not be renovated to adequately provide outpatient services. However, Dimensions and others claimed that the proposed ASTC would have an adverse effect on their medical practices because several of these parties offered the same services in the same geographic area in facilities that were underutilized. Access' existing ASTC, in contrast, provided only pregnancy-termination services. However, Access had also applied for a CON to open a multispecialty ASTC, and the Board had previously denied Access' application on the ground that facilities in the area were underutilized. The Board had also denied Dimensions a CON to relocate its existing facility on the ground that facilities in the area were underutilized.

Dimensions provided a list of five other medical-care providers to whom the Board had denied CONs to construct ASTCs in the same geographic area as Memorial's proposed project on the ground that existing facilities in the region were underutilized. Beyond making that point, Dimensions' objections were general and conclusory, consisting of assertions such as, "there are inaccuracies in outpatient information contained in [Memorial's] application," without stating what was purportedly inaccurate about the application materials. Northwest did not participate in the administrative proceedings on Memorial's CON applications.

The hearing officer allowed each person attending the hearings to give testimony and also kept the administrative record open for several additional days, until July 11, 1997, so that anyone could submit

additional written materials. Once the record was closed, the Department, acting pursuant to sections 8 and 12.2 of the Planning Act (20 ILCS 3960/8, 12.2 (West 1996 & Supp. 1997)), submitted two reports to the Board, one for each of the CON applications. Each of these reports discussed over 20 different review criteria that applicable regulations required to be considered in issuing a CON (77 Ill. Adm. Code § 1110.210 *et seq.* (1996)) and concluded that the Center for Health satisfied all but two review criteria and the ASTC satisfied all but one of the criteria. (The criteria that the Department found the project did not satisfy involved financial issues unrelated to this appeal (77 Ill. Adm. Code §§ 1120.310(e), (f) (1996)).)

At some point not reflected in the record, Michael Copeland, who worked for the Department, requested Memorial to provide some additional materials to the Board, and Memorial did so in a letter dated in September 1997. In October 1997, the Board conducted an agenda meeting, and Memorial's representatives gave oral testimony in support of the CON applications. Afterwards, the Board voted unanimously to issue Memorial both CONs. On the same day, the Board denied Northwest a CON application to operate an ASTC.

Later in October 1997, Access and Dimensions filed their complaint for administrative review in the circuit court. Northwest filed a separate complaint for administrative review of the Board's decision to grant Memorial's applications. (The record does not reflect whether Northwest appealed from the denial of its own permit application.) In July 1998, the court dismissed Northwest's separate case for lack of standing but, in August 1998, allowed Northwest to intervene in this case.

Also in August 1998, the circuit court conducted a hearing on Access and Dimensions' complaint and affirmed the Board's decision. This appeal followed.

## II. PLAINTIFFS' STANDING

■ Initially, Memorial argues, as it did in the circuit court, that Dimensions and Access lack standing to appeal the Board's decision. In *Dimensions Medical Center, Ltd. v. Suburban Endoscopy Center*, 298 Ill. App. 3d 93, 98-99, 697 N.E.2d 1231, 1235 (1998), the first district addressed the standing of these same plaintiffs to appeal from a decision of the Board granting a CON to a different defendant and wrote the following:

> "[O]nly those persons 'adversely affected by a final decision of the *** Board may have such a decision judicially reviewed.' 20 ILCS 3960/11 (West 1996). In *Condell Hospital v. Illinois Health Facilities Planning Board*, 161 Ill. App. 3d 907, [933,] 515 N.E.2d 750[, 767-68] (1987), *aff'd*, 124 Ill. 2d 341, 530 N.E.2d 217 (1988),

this court held that a 'competing health[-]care facility' was an 'adversely affected' person, and thus had standing to challenge a final decision of the [Board] granting a permit for construction of a new hospital. [Citation]; see also *Manor Healthcare Corp. v. Northwest Community Hospital*, 129 Ill. App. 3d 291, 293-94, 472 N.E.2d 492[, 494] (1984). Accordingly, plaintiffs may be said to have standing to challenge the [Board's] approval if, within the administrative record, they are shown to be 'competing health[-]care facilities.'

No serious contention may be maintained that either Access Center for Health, Ltd., or Access Health Center, Ltd., is a 'competing health[-]care facility.' Indeed, as the administrative record makes clear, neither has ever performed any [procedures to be performed in the proposed facility]. Nor could they, for they jointly operate a single-specialty ambulatory surgical treatment center limited to pregnancy terminations. Access Center for Health, Ltd., and Access Health Center, Ltd., therefore, lacked standing to challenge the [Board's] approval.

The same, however, cannot be said of Dimensions. Here, the administrative record makes clear that Dimensions, unlike [Access], is a multispecialty ambulatory surgical treatment center. In addition, the Department's report lists Dimensions as a provider of [procedures to be performed in the proposed facility]. Moreover, plaintiffs' representative testified during the public hearing that Dimensions 'provides a full range of outpatient surgical procedures ***.' Dimensions is, therefore, a 'competing health[-]care facility' and, thus, duly entitled to challenge the [Board's] approval."

With respect to plaintiffs' standing, this case is indistinguishable from *Dimensions*. Access performs only pregnancy terminations, and the proposed facility will not offer such procedures. Dimensions provides a full range of ambulatory surgical services, including the same services to be performed at Memorial's proposed facility. Thus, Dimensions has standing and Access does not. Memorial has not challenged Northwest's standing.

We will therefore address the appellant's arguments only as they apply to Dimensions and Northwest.

### III. ANALYSIS

Dimensions and Northwest argue that (1) the administrative proceedings were unfair because (a) the hearing officer prohibited them from cross-examining witnesses, and (b) the Board allowed the applicants to provide additional materials in support of their CON applications after the close of the public hearing; and (2) the Board's decision was arbitrary, capricious, and against the manifest weight of the evidence. We address these arguments in turn.

## A. The Fairness of the Public Hearing

■ When a health-care provider applies for a CON, the Department must review the application and submit its findings to the Board. In addition, the Department must afford an opportunity for a public hearing, and it must provide "[a]ll interested persons attending such hearing *** reasonable opportunity to present their views or arguments in writing or orally." 20 ILCS 3960/8 (West 1996). Those comments become part of the record that the Department submits to the Board. 20 ILCS 3960/8 (West 1996). The Board is authorized to establish rules and regulations prescribing the procedures to be followed at the public hearing. 20 ILCS 3960/12 (West 1996).

Dimensions and Northwest raise questions regarding the procedures used by the Department and the Board prior to the Board's issuing the CONs. Because Northwest did not participate in any of those procedures, we address those claims only as they relate to Dimensions.

### 1. *The Hearing Officer's Refusal To Allow Cross-Examination*

Dimensions argues that the hearing officer violated section 1200.50(a)(4) of the Board's regulations (77 Ill. Adm. Code § 1200.50(a)(4) (1996)) by not allowing cross-examination of witnesses who testified in favor of Memorial's CON applications. We conclude that Dimensions has forfeited this claim of error by failing to object or request to cross-examine witnesses at the hearing.

■ Section 1200.50(a)(4) of the Board's regulations provides, in pertinent part, that "any person *** may conduct reasonable questioning of persons who make relevant, factual allegations." 77 Ill. Adm. Code § 1200.50(a)(4) (1996). By its plain language, this regulation requires a hearing officer to allow some questioning of witnesses by a party requesting cross-examination. However, Dimensions never made such a request. By failing to do so, Dimensions forfeited this claim of error. See *Miller v. Pollution Control Board*, 267 Ill. App. 3d 160, 166, 642 N.E.2d 475, 481 (1994) (concluding, on review of an administrative decision, that the appellant forfeited arguments by failing to object at the administrative hearing).

■ Dimensions nevertheless claims that the record indicates that it was the hearing officer's decision not to allow cross-examination. In particular, Dimensions points to the following: (1) before the first hearing began, the hearing officer said, "this is not a debate"; and (2) the hearing officer did not allow Memorial's attorney to cross-examine witnesses. However, the hearing officer's statement at the beginning of the first hearing that "this is not a debate" hardly constitutes a clear prohibition on all cross-examination. Even so, Dimensions'

counsel made no request to question witnesses even as witness after witness gave testimony in favor of Memorial's application.

The first time anyone attempted to cross-examine a witness was when Bouldon testified in opposition to the project and Lawler, Memorial's counsel, attempted to cross-examine her. An extensive colloquy between the hearing officer and Lawler ensued, during which Lawler explained in detail the reasons why he believed he should be allowed to cross-examine Bouldon. Eventually, the hearing officer appeared willing to allow a brief cross-examination, as the transcript reveals:

> "HEARING OFFICER[ ]: What time limit are you talking? How detailed is your request for counsel going to be here?
>
> MR. LAWLER: I would have approximately five minutes of questioning.
>
>                   \* \* \*
>
> HEARING OFFICER[ ]: You may—."

Only then, Bouldon intervened and convinced the hearing officer that cross-examination would be inappropriate. Thus, the transcript from the hearing indicates that Bouldon actually supported the hearing officer's preclusion of cross-examination of witnesses who opposed Memorial's certificate applications, the converse of the error of which her client now complains. Dimensions therefore cannot now seek reversal on this basis.

### 2. *The Board's Allowing Memorial and the Surgical Center To Submit Additional Materials After the Public Hearing*

Dimensions also contends that we should reverse the Board's decision because the Board allowed Memorial to submit additional written materials after the public hearing had ended. Specifically, Dimensions claims that by allowing Memorial to submit the September 1997 letter in support of the CON applications, the Board violated (a) section 1200.50 of its own regulations (77 Ill. Adm. Code § 1200.50(c) (1996)), which prohibits *ex parte* contact between an applicant and Department officers; (b) section 10—40 of the Administrative Procedure Act (Procedure Act) (5 ILCS 100/10—40 (West 1996)), which requires parties be given notice and an opportunity to respond to any material submitted to an administrative agency in contested cases; and (c) fundamental fairness and due process.

### a. The Board's Regulations

Dimensions claims that the Board violated section 1200.50(c) of its own regulations by allowing Memorial to have *ex parte* contact when it submitted its letter to the Board in September 1997 without notifying Dimensions or giving it an opportunity to respond (77 Ill. Adm. Code § 1200.50(c) (1996)). We disagree.

■ Section 1200.50(c) prohibits *ex parte* contacts between an applicant and Department officers. 77 Ill. Adm. Code § 1200.50(c) (1996). However, section 1200.50(e) specifically provides that "[a]ny communications made after the commencement of the public hearing that are placed in the record or documented in the project file[ ] are not considered '*ex parte*' and are *not* prohibited." (Emphasis added.) 77 Ill. Adm. Code § 1200.50(e) (1996). Further, section 1130.640(a) (77 Ill. Adm. Code § 1130.640(a) (1996)), which governs an applicant's ability to submit supplemental information to the Board after the public hearing but before the Board's final decision, provides, in pertinent part, that "[p]rior to initial [Board] action, the applicant may provide supplemental information or data in support of the project."

■ Here, Dimensions does not contend that any of Memorial's submissions were ever kept out of the public record or the project file. On the contrary, the Board included the materials of which Dimensions now complains as part of the administrative record in its answer to Dimensions' complaint for administrative review in the circuit court. Thus, the materials did not constitute *ex parte* contact; the Board complied with all applicable regulations.

### b. The Procedure Act

■ Dimensions next argues that section 10—40 of the Procedure Act (5 ILCS 100/10—40 (West 1996)) required the Board to provide it notice and an opportunity to respond to any materials Memorial submitted in response to questions from the Department or Board. Specifically, Dimensions points out that section 10—40(c) of the Procedure Act requires "parties" to be provided notice and an opportunity to respond to any materials of which an administrative agency takes notice in a contested case. 5 ILCS 100/10—40(c) (West 1996). Thus, Dimensions claims that it should have been notified of and provided an opportunity to respond to any additional material submitted in support of the application. We disagree.

■ The problem with Dimensions' position is twofold. First, section 10—40 of the Procedure Act protects only "parties," a term of art defined elsewhere in the Procedure Act as a "person or agency named or admitted as a party or properly seeking and entitled as of right to be admitted as a party." 5 ILCS 100/1—55 (West 1996). Dimensions was not named as a party on Memorial's application, nor did it at any time seek to become a party to the hearing. It simply attended the public hearing and provided a point of view, just as any other member of the public was able to do.

Second, section 18 of the Planning Act provides that the Procedure Act shall apply to the Board and the Department "except that in

case of a conflict between the [Procedure Act] and [the Planning Act] the provisions of [the Planning Act] shall control." 20 ILCS 3960/18 (West 1996). Section 13 of the Planning Act authorizes the Department or the Board to conduct investigations regarding any application for a permit, and allows them to subpoena records and administer oaths to witnesses as part of those investigations. 20 ILCS 3960/13 (West 1996). That investigatory authority would be impossible to implement if section 10—40 of the Procedure Act were to require the Board to allow all objectors, such as Dimensions, to shadow every inquiry the Board made of an applicant. Thus, even if we were to conclude that Dimensions was a "party" within the meaning of the Procedure Act, we would also conclude that the Planning Act's provisions conflict with section 10—40 of the Procedure Act and render them inapplicable to this situation.

Accordingly, we conclude that section 10—40 of the Procedure Act does not apply to the posthearing submission of materials in support of a CON application.

### c. Fundamental Fairness

Citing *Southwest Energy Corp. v. Pollution Control Board*, 275 Ill. App. 3d 84, 97, 655 N.E.2d 304, 312 (1995), Dimensions argues that we should reverse because the Board's consideration of Memorial's additional submissions was fundamentally unfair. In a closely related argument, Dimensions claims that it was fundamentally unfair for the Board to allow Memorial's representatives to provide testimony at the Board's agenda meeting when the Board approved the CON applications without allowing Dimensions to provide testimony at that meeting. We disagree.

Initially, we note that in *Southwest Energy*, this court was reviewing a decision of the Illinois Pollution Control Board made pursuant to the Environmental Protection Act (Environmental Act) (415 ILCS 5/1 *et seq.* (West 1992)), in which the Illinois Pollution Control Board had reversed a decision by a local governing body because the procedures that body used were fundamentally unfair. Central to our decision in that case was section 40.1 of the Environmental Act, which required the Illinois Pollution Control Board to consider whether the procedures were fundamentally unfair. *Southwest Energy*, 275 Ill. App. 3d at 90, 655 N.E.2d at 308, citing 415 ILCS 5/40.1 (West 1992). Thus, by statute, a lack of fundamental fairness warranted the Illinois Pollution Control Board's reversal in that case.

In this case, the statute at issue contains no similar provision requiring reversal due to a lack of fundamental fairness. Perhaps for that reason, Dimensions insists that its due process rights were abridged by allegedly unfair procedures.

■ A reviewing court will reverse an administrative agency's decision if the procedures used by the agency violated a party's due process rights. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92-93, 606 N.E.2d 1111, 1119 (1992); *Cochrane's of Champaign, Inc. v. Illinois Liquor Control Comm'n*, 285 Ill. App. 3d 28, 32, 673 N.E.2d 1176, 1179 (1996). "The starting point, in any due process analysis, is a determination of whether [a] protect[i]ble interest[ ]—life, liberty[,] or property—is present, 'for if there is not, no process is due.' " *Balmoral Racing Club, Inc. v. Illinois Racing Board*, 151 Ill. 2d 367, 405, 603 N.E.2d 489, 505 (1992), quoting *Polyvend, Inc. v. Puckorius*, 77 Ill. 2d 287, 294, 395 N.E.2d 1376, 1378-79 (1979). Plaintiffs have not addressed this threshold question. In *Petersen v. Plan Comm'n*, 302 Ill. App. 3d 461, 467, 707 N.E.2d 150, 154-55 (1998), the appellate court addressed whether objectors to a permit to expand a local museum had a property interest in the outcome of the proceedings for due process purposes and determined that they did not. In so holding, the court wrote the following:

> "In this case, the circuit court granted plaintiffs standing to sue, but this status did not create a constitutionally protect[i]ble interest such as a property interest. Standing was conferred due to [a nearby park's] recreational and aesthetic availability and given the role the park system plays for all citizens of the Chicago area. [Citation.] However, a property interest is involved only if 'a person clearly [has] more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.' [Citation.]
>
> Plaintiffs had no property interest at stake at this administrative hearing ***. While their interest as citizens entitles them to enjoy the park and to desire that it be preserved, it does not rise to the level of a protect[i]ble interest such as one's interest in property [citation], or in maintaining a professional license [citation]. Thus, plaintiffs did not have any constitutionally protected interest in the nonexpansion and renovation of the [m]useum." *Petersen*, 302 Ill. App. 3d at 467, 707 N.E.2d at 154-55.

■ Similarly here, Dimensions apparently claims that its interest in providing medical care in a protected market amounts to a "property" interest for due process purposes. However, nothing in the administrative record suggests that the interest Dimensions claims is at stake rises to the level of a "legitimate claim of entitlement" that should be afforded constitutional protection. As did the circuit court in *Petersen*, we have concluded that Dimensions' interest in the proceedings was sufficient to confer standing. However, that interest does not rise to the level of a constitutionally protected property interest.

Furthermore, even if we were to conclude that Dimensions had a

protectible property interest, the proceedings used by the Board in this case were not so unfair as to abridge due process. Due process is flexible and calls only for such procedural protections as the particular situation demands. *East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 419, 687 N.E.2d 1050, 1062 (1997). In the setting of an administrative proceeding, " '[i]t is, of course, well recognized that not all the accepted requirements of due process in the trial of a case are necessary \*\*\*.' " *Petersen*, 302 Ill. App. 3d at 469, 707 N.E.2d at 156, quoting *Fox River Valley District Council of Carpenters v. Board of Education of School District No. 231*, 57 Ill. App. 3d 345, 349, 373 N.E.2d 60, 63 (1978). Instead, the only procedure required is one that is suitable and proper to the nature of the determination to be made and that conforms to fundamental principles of justice. " 'All that is necessary is that the procedures be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard," [citation], to insure that they are given a meaningful opportunity to present their case.' " *Petersen*, 302 Ill. App. 3d at 466, 707 N.E.2d at 154, quoting *Mathews v. Eldridge*, 424 U.S. 319, 349, 47 L. Ed. 2d 18, 41, 96 S. Ct. 893, 909 (1976).

Under the Planning Act, the Board must consider both the private interests of permit applicants and the public interest in the development of well-planned health-care facilities. 20 ILCS 3960/2 (West 1996). The Planning Act provides a balanced means to insure that the public and private interests at stake in a permit application process are addressed. The Department must allow members of the public to appear at a public hearing and provide their views. Further, that testimony becomes part of the administrative record to be considered by the Board in granting or denying the permit. 20 ILCS 3960/8 (West 1996). At the same time, the Board and the Department have the investigative powers to ensure that the decision reached is in fact in the public's best interest. 20 ILCS 3960/12.2 (West Supp. 1997).

In our judgment, the public hearing provisions of the Planning Act and related regulations provided Dimensions with " 'a meaningful opportunity to present [its] case.' " *Petersen*, 302 Ill. App. 3d at 466, 707 N.E.2d at 154, quoting *Mathews*, 424 U.S. at 349, 47 L. Ed. 2d at 41, 96 S. Ct. at 909. Further, we are not persuaded that the Department's and Board's exercise of their ability to proactively seek additional information, nor an applicant's ability to respond to assertions made at the public hearing and inquiries from the Board by providing supplementary information, somehow distorted the process to such a degree that it did not conform to fundamental principles of justice. Accordingly, we conclude that Dimensions received all the process it was due.

## B. Manifest Weight of the Evidence

Last, Dimensions and Northwest argue that the Board's decision to grant the CONs to Memorial was not supported by the administrative record. Specifically, Dimensions and Northwest cite this court's decision in *Springwood Associates v. Health Facilities Planning Board*, 269 Ill. App. 3d 944, 948, 646 N.E.2d 1374, 1376 (1995), for the proposition that the Board cannot deviate from its own regulations in an arbitrary fashion. Dimensions and Northwest primarily claim that, in granting the CONs to Memorial, the Board ignored the requirements of section 1110.1540(g) of the Board's regulations (77 Ill. Adm. Code § 1110.1540(g) (1997)), which provides that an applicant seeking to establish an ASTC in an area where existing facilities are underutilized must demonstrate that the proposed facility will improve access to care.

Memorial responds that the record supports the Department's conclusion, adopted by the Board, that the proposed facility would improve access to care by alleviating overcrowding in Memorial's operating rooms at its existing hospital. We agree with Memorial.

The Planning Act requires the Board to approve any application for a permit if it finds that (1) the applicant is fit, willing, and able to provide the proper standard of care; (2) the proposed project is economically feasible; (3) the proposed project is consistent with the public interest; and (4) the proposed project is consistent with the orderly and economic development of health-care facilities. 20 ILCS 3960/6 (West 1996); *Springwood Associates*, 269 Ill. App. 3d at 947-48, 646 N.E.2d at 1375-76. In *Access Center for Health, Ltd. v. Health Facilities Planning Board*, 283 Ill. App. 3d 227, 234, 669 N.E.2d 668, 673 (1996), the court discussed the appropriate standard of review of the Board's determination of these factors as follows:

> "In *Greer* [*v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 505-06, 524 N.E.2d 561, 581 (1988)], our supreme court set out guidelines for determining whether an action by an administrative agency was arbitrary and capricious. The court stated:
>
> 'While it is probably not possible to enumerate all the kinds of acts or omissions which will constitute arbitrary and capricious conduct, the following guidelines apply. Agency action is arbitrary and capricious if the agency: (1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. [Citation.] While an agency is not required to adhere to a certain

policy or practice forever, sudden and unexplained changes have often been considered arbitrary. [Citation.] The standard is one of rationality. The scope of review is narrow and the court is not, absent a "clear error of judgment" [citation], to substitute its own reasoning for that of the agency.' [Citation.]"

In addition, an agency cannot ignore its own regulations in issuing a decision. *Springwood Associates*, 269 Ill. App. 3d at 948, 646 N.E.2d at 1376. Thus, the Board was required to follow section 1110.1540(g)(3) of its regulations, which provides, in relevant part, as follows:

"Any applicant proposing to establish an [ASTC] will be approved only if one of the following conditions exists:

* * *

3) The applicant can document that the facility is necessary to improve access to care. Documentation shall consist of evidence that the facility will be providing services which are not currently available in the geographic service area, or that existing underutilized services in the geographic service area have restrictive admission policies." 77 Ill. Adm. Code § 1110.1540(g)(3) (1997).

The Department found that the proposed project was necessary to improve access to care because Memorial's existing surgical facilities at the hospital were overcrowded and not adequately designed to accommodate outpatient surgery patients. Because Memorial's proposed ASTC would draw solely from Memorial's existing patient base, the Department concluded that the ASTC would improve access to care for those patients by eliminating the need for them to choose between changing physicians or using the overcrowded hospital facilities.

As we earlier noted, Memorial supplied documentation supporting this conclusion, and no one attending the public hearing seriously challenged Memorial's assertions. Even in this appeal, Dimensions and Northwest do not claim that the Department's finding regarding the overcrowding of Memorial's facilities was not supported by evidence. Instead, Dimensions and Northwest focus on the second sentence of section 1110.1540(g)(3), requiring that "[d]ocumentation [of improved access to care] shall consist of evidence that the facility will be providing services which are not currently available in the geographic service area, or that existing under[ ]utilized services in the geographic service area have restrictive admission policies." 77 Ill. Adm. Code § 1110.1540(g)(3) (1997). Dimensions claims that because it offers a full range of outpatient surgical procedures, all the services to be offered in Memorial's proposed ASTC are available within the geographic area. Dimensions and Northwest also claim that Memorial did not document that other ASTCs in the area have restrictive admission policies.

A document Memorial provided in support of its application includes the following explanation:

. "All ASTCs and hospitals have restrictive admission policies. No surgeon can admit a patient for surgery or perform surgical procedures unless the surgeon has been granted medical[-]staff membership and privileges (77 Ill. Adm. Code [§§ 205.530, 205.320 (1996)]). The vast majority of patients to be treated at [the proposed ASTC] could not be treated at any other facility because their surgeons are not on the medical staffs and do not have privileges at those facilities.

As part of our process, we surveyed the 65 members of [Memorial's] surgical staff who signed the [l]etters of [i]ntent to refer patients to the [ASTC] *** in order to ascertain their medical[-] staff privileges at existing ASTCs. *** Fifty-seven of the 65 surgeons responded to the survey, of whom 35 do not have medical [-]staff privileges at any other ASTC.

As noted above, the projected caseload for the [proposed ASTC] is based solely upon outpatient surgical cases which were performed at [Memorial], regardless of whether any of the surgeons performing those cases also had medical[-]staff privileges at any ASTC."

A hypothetical situation could exist in which Memorial's suggested interpretation of what constitutes a "restrictive admission policy" would give rise to abuse. After all, if the only showing necessary to demonstrate need for a new facility was that existing facilities obeyed the law by only allowing physicians with privileges to perform surgical procedures (77 Ill. Adm. Code §§ 205.530, 205.320 (1996)), then section 1110.1540(g)'s requirement that a CON applicant demonstrate need for the facility would become vacuous.

■ Applied to the particular circumstances of this case, however, Memorial's suggested interpretation is appropriate. Here, Memorial demonstrated that the proposed facility's target population would be Memorial's existing patient base, and no one has seriously challenged that position in either the administrative hearing or on appeal. From the perspective of those patients—as opposed to some abstract at-large population in the geographic area—access to existing facilities was hindered by their own physicians' lack of access to those facilities. Thus, the Board could appropriately conclude that the proposed facility was "necessary to improve access to care" for Memorial's existing patient base, just as section 1110.1540(g) requires.

Indeed, if we are to take the supreme court at its word that "[t]he standard is one of rationality," then it would be difficult to defend Dimensions' and Northwest's suggested application of section 1110.1540(g). Under their proposed standard, a successful medical-care provider, such as Memorial, would be forbidden from expanding

to provide for the needs of *its own patients* just because some other facilities in the area cannot maintain an adequate patient base. The public would, under Dimensions' and Northwest's proposed regime, be forced to seek medical services at facilities that—for whatever reason—it had not chosen for that purpose. As a secondary effect, part of the incentive for medical-care providers to do good work would disappear. Those that do well would be forbidden from enjoying the fruits of their efforts, and those that do poorly would be guaranteed a patient base because the Board would simply deny permits to build new facilities in the area until the reluctant public finally made sufficient use of all existing facilities.

An agency's interpretation of its own regulations is subject to some deference on review. *Springwood Associates*, 269 Ill. App. 3d at 948, 646 N.E.2d at 1376. Consistent with that deference, we are not prepared to conclude that the Board's application of section 1110.1540(g) constituted arbitrary and capricious conduct.

Finally, Dimensions and Northwest point to several additional regulations requiring certain types of documentation and claim that Memorial's CON applications did not meet the requirements of those regulations. Addressing each of these contentions in detail would only serve to unnecessarily lengthen this opinion. Suffice it to say that (1) beyond conclusory comments, Dimensions did not point out any of these alleged deficiencies at the public hearing; and (2) we have carefully reviewed the administrative record and conclude that Memorial provided documentation that (a) the facility's location would not create a maldistribution of beds and services (77 Ill. Adm. Code § 1110.230(a)(2) (1996)); (b) the facility would serve a population in need of services (77 Ill. Adm. Code § 1110.230(f) (1996)); (c) the proposal was the least costly alternative (77 Ill. Adm. Code § 1110.230(e) (1996)); and (d) an adequate supply of manpower existed to staff the facility (77 Ill. Adm. Code § 1110.230(c) (1996)).

## IV. CONCLUSION

For the reasons stated, we affirm the circuit court's judgment.

Affirmed.

COOK and MYERSCOUGH, JJ., concur.