No. 3--07--0435

Filed October 7, 2008

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2008

| | | |
|---|---|---|
| PEORIA DISPOSAL COMPANY, | ) | Appeal from the Illinois |
| | ) | Pollution Control Board, |
| Petitioner-Appellant, | ) | Docket No. PCB 06-184 |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS POLLUTION CONTROL | ) | |
| BOARD and COUNTY OF PEORIA, | ) | |
| | ) | |
| Respondent-Appellees. | ) | |

JUSTICE CARTER delivered the opinion of the court:

Petitioner, Peoria Disposal Company (the company), applied for local siting approval to expand its regional landfill in Peoria County. The Peoria County Board (the county board) denied the application. The company petitioned the Pollution Control Board (the PCB) for review of that decision. The PCB upheld the county board's ruling. The company appeals the PCB's decision directly to this court, arguing that: (1) the application should be deemed approved by operation of law because the county board failed to take final action upon the application within the time period required by statute, (2) the proceedings before the county board were fundamentally unfair, and (3) the determination that the company had failed to meet the statutory siting criteria is against the manifest weight of the evidence. We confirm the PCB's ruling.

FACTS

The company owns and operates a 32-acre landfill in unincorporated Peoria County and has

done so for several years. The landfill receives industrial waste, a portion of which is hazardous waste. Over time, new residential development has grown toward the landfill on the east and north sides of the company's property. The nearest residence is about 200 or 300 feet from the boundary of the current facility. In November of 2005, the company sought local approval to expand the landfill by 45 feet vertically and 8 acres horizontally. The expansion would allow the landfill to continue to operate for an additional 15 years and to take in over 2 million tons of additional waste.

The statutory procedure for such an expansion is set forth in the Illinois Environmental Protection Act (415 ILCS 5/1 et seq. (West 2006)) (the Act). Under the Act, before a party may obtain a permit from the Illinois Environmental Protection Agency to build or expand upon a pollution control facility, it must first obtain siting approval from the local government (the local siting authority) where the facility is to be located. 415 ILCS 5/39.2(a) (West 2006). To do so, the applicant must prove to the local siting authority that nine statutory criteria have been satisfied. 415 ILCS 5/39.2(a) (West 2006). The applicant must show that: "(i)  the facility is necessary to accommodate the waste needs of the area it is intended to serve; (ii) the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected; (iii) the facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property; (iv)(A) for a facility other than a sanitary landfill or waste disposal site, the facility is located outside the boundary of the 100 year flood plain or the site is flood-proofed; (B) for a facility that is a sanitary landfill or waste disposal site, the facility is located outside the boundary of the 100-year flood plain, or if the facility is a facility described in subsection (b)(3) of Section 22.19a, the site is flood-proofed; (v) the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills,

2

or other operational accidents; (vi) the traffic patterns to or from the facility are so designed as to minimize the impact on existing traffic flows; (vii) if the facility will be treating, storing or disposing of hazardous waste, an emergency response plan exists for the facility which includes notification, containment and evacuation procedures to be used in case of an accidental release; (viii) if the facility is to be located in a county where the county board has adopted a solid waste management plan consistent with the planning requirements of the Local Solid Waste Disposal Act or the Solid Waste Planning and Recycling Act, the facility is consistent with that plan ***; and (ix) if the facility will be located within a regulated recharge area, any applicable requirements specified by the Board for such areas have been met." 415 ILCS 5/39.2(a) (West 2006). If the applicant fails to satisfy any one of the statutory criteria, the application for siting approval will be denied by the local siting authority. 415 ILCS 5/39.2(a) (West 2006); A.R.F. Landfill, Inc. v. Pollution Control Board, 174 Ill. App. 3d 82, 90, 528 N.E.2d 390, 395 (1988).

Pursuant to the statutory procedure, the company applied with Peoria County for local siting approval of the expansion. See 415 ILCS 5/39(c), 39.2(a) (West 2006). Of relevance to this appeal, in the application, the company stated that the sands underlying the proposed expansion site are conservatively assumed to be connected to the sands of the Sankoty Aquifer, an aquifer which supplies drinking water to the region. The nearest residence is about 750 feet away from where the expansion will be located. The application, a $50,000 application fee, and 43 boxes of supporting documents were received by the county clerk's office on November 9, 2005. The Peoria County code requires the county clerk's office to confirm that an application of this nature satisfies the county's filing requirements before accepting the application for filing. After reviewing the materials, on November 14, 2005, the county clerk's office determined that the application was administratively

3

complete. Pursuant to the procedure set forth in the county code, the clerk's office gave the application a file-stamped date of November 14, 2005.

From February 21 through February 27, 2006, a public hearing was held on the application. Two organized groups, Peoria Families Against Toxic Waste and the Heart of Illinois Chapter of the Sierra Club (collectively referred to as the opposition groups), participated in the public hearing and opposed the application. The hearing lasted for six days, with one full day dedicated to the receipt of public comment. The evidence presented at the hearing is summarized below. Only the evidence that is relevant to the statutory criteria in dispute in this appeal has been presented.

As to criterion(i)–that the facility is necessary to accommodate the waste needs of the area it is intended to serve–the company presented the testimony of one witness. Sheryl Smith, a senior project manager with a master's degree in engineering and over 20 years of experience in waste management, conducted an analysis of the service area for the company and prepared a report of her conclusions. Smith determined that over the 15-year life span of the proposed expansion, there would be a significant shortfall in waste disposal capacity in the service area for waste streams received by the company. Smith opined, therefore, that the proposed facility (expansion) is necessary to accommodate the waste needs of the service area it is intended to serve.

On cross-examination, Smith acknowledged that the service area that she considered for hazardous waste encompassed only a 10-state area when the company had historically received hazardous waste from a 13-state area. Smith stated that she used waste generation information that was provided to her by the company and that she did not conduct a separate analysis to determine if that information was accurate. Smith admitted that she did not consider reports by the United States Environmental Protection Agency (USEPA) and the Army Corps of Engineers projecting

4

national waste generation rates over the next several years because she felt that the information was too dated. Smith also admitted that she did not consider the newest reports from USEPA and acknowledged that those reports showed that the rate of hazardous waste being generated was decreasing, but testified that the data contained in the newer reports would not have changed her opinion. Smith stated that she did not agree with the testimony of Dr. Daniels, presented by the company on another criterion, that the stream of hazardous waste being sent to landfills was decreasing. Smith acknowledged that although the market conditions for hazardous waste are dynamic and subject to change, she used a static model in conducting her analysis.

As to criterion (ii)–that the facility is designed, located, and proposed to be operated to protect human health, safety, and welfare–the company presented the testimony of five witnesses. Ron Edwards, the vice president of development and operations of the company, testified regarding the history of the company, the regulations that exist for the disposal of industrial waste, the operation of the current facility, and the plan of operation for the proposed expansion.

George Armstrong, the company's vice president of technical services and a professional engineer, testified regarding the capacity of the current facility and the capacity and design of the proposed expansion. Armstrong described the geology and hydrogeology of the proposed site, the liners and the leachate collection system that will be used in the expansion area, and the closure and postclosure treatment of the facility. In studying the site, Armstrong determined that the nearest known active community water supply well is operated by the Pleasant Valley Public Water District and is located down-gradient of the site, about 1.6 miles away. Based upon his knowledge and experience, Armstrong opined that the proposed expansion of the landfill is designed, located, and will be operated in such a manner as to protect public, health, safety, and welfare.

5

Kenneth Liss, the director of environmental services at Andrews Environmental Engineering (Andrews Engineering) and a licensed professional geologist, testified regarding the groundwater monitoring program, the leachate generated by the facility, and the drainage of that leachate based on the geology and hydrogeology of the site. Andrews Engineering conducted an independent review of the site data for the company.

Dr. Larry Barrows, a licensed professional geologist, conducted a groundwater impact study of the proposed landfill expansion for the company through Andrews Engineering. Barrows used site data to develop a conceptual model of groundwater flow and then applied computer programs to that model. Based on the results of the study, Barrows opined that the proposed expansion would not adversely effect the groundwater. Barrows predicted that even after 500 years, the proposed expansion would not have a negative impact on groundwater quality.

Dr. David Daniel, former Dean of the College of Engineering at University of Illinois and current president of the University of Texas, at Dallas, conducted a peer review of the site characterization and the design analysis. Daniel's credentials and experience in civil engineering and in landfill projects are extensive. During his testimony, Daniel described and commented upon the design of the proposed expansion and how that design would hold up over time. Based upon his experience and his review of the application and the materials, Daniel opined that the proposed expansion is designed, located, and proposed to be operated so that the public health, safety, and welfare would be protected.

Four witnesses testified for the opposition groups as to criterion (ii). Charles Norris, a licensed professional geologist who has been involved in more than a dozen siting proceedings in Illinois, testified that he disagreed with some of the conclusions drawn by the company's witnesses. Norris conducted a visual inspection of the site, reviewed the company's application and some of

6

the supporting materials, and concluded that the company's representation of the site's geology and hydrogeology is directly contradicted by the data. Norris opined that water drains rapidly through the site and that it takes with it any contaminants that are not located in the containment structures. Norris explained the reasoning behind his opinion. Norris criticized the company's analysis showing that groundwater quality would not be effected stating that the model used in that study was not properly calibrated and was not properly verified with the site data. Based upon his inspection of the site and his review of the company's data, Norris concluded that the geology of the hydrogeology of the site will not provide a safety backup system to the engineered system of containment.

On cross-examination, Norris acknowledged that he is not an engineer, that he has never designed a landfill, and that he works out of his home in Colorado. Norris admitted that he has testified for opposition groups in siting proceedings more than a dozen times and that in each one of those cases, he has opined that fluid would move significantly faster through the site than the applicant had represented in the application.

Timothy Montague testified for the opposition group about landfill and landfill liners in general. Montague is not an engineer or a geologist, had not seen the application in question, and merely gave testimony based upon literature he had reviewed.

Dr. Gary Zwicky, a diagnostic radiologist and president of the medical staff of OSF St. Francis, testified regarding the medical community's concerns about the potential short- and long-term health consequences that the facility poses to Peoria County. Zwicky had not reviewed the application in the present case and had no special experience with landfills.

Dr. Michael Vidas, an ear, nose, and throat specialist, testified regarding the medical risks that arise from toxins that are placed into landfills and about cancer rates in Peoria County. As with Dr. Zwicky, Dr. Vidas had not review the application and had no special experience in landfills.

7

As to criterion (iii)–that the facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property–the company presented two witnesses. Chris Lannert, a landscape architect and land use planner, testified regarding the character of the proposed expansion as it relates to the surrounding property. Lannert pointed out that the company owns 350 acres of property surrounding the site, which will act as buffer between the proposed expansion and residential uses, and that a number of the county residents do not even know where the landfill is located. Lannert did not propose any type of screening berms for the proposed expansion site and stated that the site is effectively screened from view by the existing vegetation and topography. Lannert determined that the predominant land use in the area is open space and testified that the company's end use plan for the site of passive land use is compatible with the other uses in the area. Lannert concluded, therefore, that the design of the proposed expansion is compatible with the character of the surrounding area.

On cross-examination, Lannert admitted that the proposed vertical expansion would be visible to the nearby residential neighborhoods. Lannert also noted that the project would be visible as a dirt construction project during the entire period of the expansion until the expansion is finished and then covered.

Gary DeClark, a real estate valuation consultant, conducted a study of real estate values in the area and in similar areas and testified for the company that the proposed expansion would not have a negative impact on the property values of the surrounding properties.

As to criterion (v)–that the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents–the company presented one witness. Ron Edwards testified regarding the current operation of the facility and the plan of operation for the proposed expansion. Edwards opined that the plan of operations for the

8

proposed expansion is designed to comply with criterion (v).

At the conclusion of the public hearing, the attorneys for each side made their closing remarks. One of the attorneys for the company commented that the proceedings were fundamentally fair.

The county board received numerous public comments regarding the application, both at the hearing and in the 30-day public comment period after the hearing. In all, over a thousand pages of public comment, for and against the application, were received. The majority of that public comment was opposed to the application. The public comment period ended on March 29, 2006.

To assist the county board in making its decision, county staff, including outside consultants, reviewed the application materials and the evidence gathered at the public hearing and prepared a detailed report on the matter for the county board. Both an initial and a supplemental report were prepared. In the reports, county staff recommended that the application be approved with certain conditions added. As to criterion (v), county staff noted in the report that the company's attorney, in response to public concern, had proposed at the public hearing that a perpetual care fund be established to maintain and take care of the facility post closure. The company offered to deposit into the fund $0.13 per ton of waste per year for the entire 15-year life span of the proposed expansion. County staff, however, felt that the company's estimate was too conservative and recommended that the company be required to deposit $1.50 per ton of waste and not less than $225,000 per year.

In April of 2006, the county's site hearing committee (the committee), which is comprised of all of the members of the county board, held meetings to discuss the matter. At its first meeting on April 3, 2006, the special assistant State's Attorney informed the committee that it had to base its decision exclusively on the information contained in the public record compiled in the application

9

process.

At the committee's second meeting, on April 6, 2006, the committee voted on proposed findings of fact. The committee engaged in an extensive discussion of each of the statutory criteria. During that discussion, one of the board members, Mr. Elsasser, commented on possible water and air emissions and discussed some of his personal experiences–that his father's heart raced for a day after breathing in a product that had been put into the ground and that his brother was a medical doctor for 20 years. After Elsasser made those comments, one of the other board members, Mr. Widmer, pointed out that the board was supposed to make its decisions based upon the evidence and not upon speculation. After its discussion had concluded, the committee decided to recommend that criteria (i), (ii), and (iii) had not been satisfied. As to criterion (v), the committee decided to recommend that it had been satisfied but only if certain special conditions were added, including one calling for the creation of a perpetual care fund. The committee heard extensive discussion from county staff regarding how staff determined the appropriate amount to be deposited by the company into the fund, including a consideration of the company's revenue stream from waste disposal. Rather than adopting county staff's recommendation, the committee recommended that the company deposit $5 per ton of waste into the perpetual care fund and no less than $750,000 per year. The committee approved a set of proposed factual findings in support of its conclusion on the matter. The proposed written findings of fact were filed with the county clerk on April 27, 2006, after the public comment period had ended. That same day, the company filed a motion asking the committee to reconsider its decision to recommend a denial of the application.

On May 3, 2006, the county board met to vote on the application. Prior to the May 3 meeting, the board members were advised by the state's attorney regarding the procedure that would be followed. In the letter, the State's Attorney informed the county board members that they would

10

be taking two votes at the meeting. The first vote would be on a motion to approve the application. As to that vote, the State's Attorney advised that if the motion to approve the application did not pass, an additional vote denying the application would not be necessary. The state's attorney instructed further that the second vote that the county board would take at the meeting would be to approve a set of findings of fact in support of the decision on the application.

At the hearing itself, on the record, the State's Attorney again advised the county board as to the appropriate procedure. The State's Attorney told the county board that if they voted against the motion to approve the application, they would not have to take a second vote and specifically deny the application. During a discussion of potential bias, one of the board members asked if any of the members of the board were also members of the Sierra Club. Board members Mayer and Thomas responded affirmatively. The State's Attorney questioned both of the board members about their membership in the Sierra Club. Both responded that they were essentially inactive members of the national club and that they had never attended any of the local Sierra Club meetings. As part of that discussion, all of the board members were asked if they could decide the case impartially based solely on the facts presented. All of the board members responded that they could. In addition, it was pointed out to the county board that both sides had filed numerous documents with the county clerk after the public comment period had ended.

After a discussion of all of the preliminary matters had been completed, a motion was made and seconded to approve the company's application for local siting approval. Following a discussion, a vote was taken on the motion. Twelve members voted against the motion and six members voted in favor of the motion. A second vote was taken as to the findings of fact. By a vote of 12 to 6, the county board approved the previously filed findings of fact with the understanding that some minor changes would be made. An unofficial transcript of the meeting was posted on the

11

county's Web site on May 12, 2006. The transcript was later approved and adopted by the county board at its June meeting.

In June of 2006, the company petitioned the PCB for review of the county board's decision. In its petition, the company alleged for the first time that the effective filing date of the application was November 9, 2005, when it was received by the county clerk, and that the county had failed to take final action on the application within 180 days as required by statute. The company also argued that the proceedings before the county board were fundamentally unfair and that the county's board's decision was against the manifest weight of the evidence. The opposition groups were granted leave to participate in the proceedings and opposed the company's arguments. In addition to the record of the proceedings before the county board, the PCB received evidence on the fundamental fairness of the proceedings. Discovery conducted after the county board had rendered its decision showed that several of the board members had received ex parte e-mails, letters, and telephone calls during the siting proceeding, both for and against the application. Some of those communications were made part of the record; however, several were not because the county board members had disposed of them.

After considering the record of the proceedings before the county board and the additional evidence regarding fundamental fairness, the PCB affirmed the county board's ruling. In a lengthy written decision, the PCB found that November 14, 2005, was the effective starting date of the 180 day statutory period. In reaching that conclusion, the PCB pointed out that November 14 was used as the starting date throughout the entire proceedings before the county and that the company never objected to the use of that date. The PCB went on to conclude, however, that regardless of whether a November 9 or a November 14 starting date was used, the county board took final action on the company's application within the 180-day period when it voted against the motion to approve the

12

application at the meeting on May 3, 2006 (the May 3 meeting). The PCB stated that it was clear from the record that the county board, by its vote, intended to deny the requested siting. The PCB held that a separate vote to deny the application was not necessary. The PCB also found that the written decision requirement of section 39.2(e) was satisfied by the verbatim transcript of the May 3 meeting and the county board's approved findings of fact. In reaching that conclusion, the PCB ruled, although somewhat implicitly, that section 39.2(e) requires only that the local governmental authority take action on the application within 180 days, not that a written decision be issued within 180 days. The PCB noted that for purposes of the section 39.2(e) requirements, a distinction exists between the "final action" of the local governmental authority and its formal written "decision" memorializing that final action. Turning to the issue of fundamental fairness, the PCB found that the company was not prejudiced by any ex parte communications that occurred during the proceedings before the county and that the company had forfeited any claims of bias by failing to raise those claims in the original proceedings. The PCB concluded, therefore, that the proceedings before the county board were fundamentally fair. As to the statutory criteria, the PCB found that the county board's determination–that the company had failed to satisfy statutory criteria (i), (ii), (iii), and (v)–was not against the manifest weight of the evidence. This appeal followed.

ANALYSIS

On appeal, the company argues first that the county board failed to take final written action on the application within 180 days, as the company alleges is required by statute, and that the application, therefore, should be deemed approved by operation of law. The company asserts that the PCB erred in reaching the opposite conclusion. In support of its argument, the company contends that: (1) section 39.2(e) of the Act requires the local siting authority to take final action on the application and to issue its written decision in that regard within 180 days after the application

13

is received; (2) Title 35, section 107.204, of the Illinois Administrative Code makes it abundantly clear that the local siting authority's written decision must be issued within the 180-day period; (3) the 180-day period in the present case started to run on November 9, 2005, when the application was received by the county clerk; (4) the county did not have the authority to extend the effective starting date to November 14, 2005, the date that the county clerk confirmed that the application was administratively complete; (5) the county board did not take final action on the application at the May 3 meeting since the county board did not specifically vote to deny the application as required by its own rules of procedure; (6) it is unclear from the chaotic and inconsistent proceedings what action, if any, the county board took on the application at the May 3 meeting; and (7) any decision made by the county board on the application at May 3 meeting was not reduced to writing within the 180-day period since the county board did not adopt a resolution regarding its decision, did not prepare any written minutes of the county board meeting, and did not officially approve a transcript of the meeting until after the 180-day period had ended.

The PCB and the county argue that the PCB's decision was proper and should be affirmed. The PCB and the county dispute the company's contentions and assert that the statute does not require that a written decision be issued within the 180-day period, and that even if it does, that requirement was satisfied in the present case. The PCB also argues that this appeal should be dismissed because the company failed to properly name the county board as a party in their petition for review with this court. That argument was previously raised in a motion to dismiss filed by the PCB. We denied that motion and will not address that argument further in this appeal.

Before we reach the merits of the remaining arguments, we must determine the appropriate standard of review to be applied to the PCB's ruling on this particular issue. The company argues that the appropriate standard of review is de novo because this issue involves a question of statutory

14

interpretation and because none of the facts relevant to this issue are in dispute. See <u>Waste Management of Illinois, Inc. v. Pollution Control Board</u>, 356 Ill. App. 3d 229, 231-32, 826 N.E.2d 586, 589 (2005). The PCB argues that this issue involves factual findings and that the PCB's decision on this issue, therefore, should not be reversed unless it is against the manifest weight of the evidence. See <u>Roti v. LTD Commodities</u>, 355 Ill. App. 3d 1039, 1051, 823 N.E.2d 636, 645 (2005). The county argues that this issue involves a mixed question of law and fact and that the appropriate standard of review, therefore, is the clearly erroneous standard. See <u>City of Belvidere v. Illinois State Labor Relations Board</u>, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998).

It is well established that the standard of review to be applied to an administrative agency's decision varies depending on whether the question raised is a question of law, a question of fact, or a mixed question of law and fact. See <u>City of Belvidere</u>, 181 Ill. 2d at 204, 692 N.E.2d at 302. If a question of law is raised, the standard of review is <u>de novo</u>. <u>City of Belvidere</u>, 181 Ill. 2d at 205, 692 N.E.2d at 302. If a question of fact is raised, the standard of review is the manifest weight standard–the agency's determination will not be reversed unless it is against the manifest weight of the evidence. <u>City of Belvidere</u>, 181 Ill. 2d at 205, 692 N.E.2d at 302. And, if a mixed question of law and fact is raised, the agency's decision is subject to a clearly erroneous standard of review. <u>City of Belvidere</u>, 181 Ill. 2d at 205, 692 N.E.2d at 302. Our decision on this issue centers around an interpretation of section 39.2(e) of the Act. Statutory interpretation is a question of law, so our standard of review is <u>de novo</u>. Under <u>de novo</u> review, we are not bound by the PCB's ruling on this issue. <u>City of Belvidere</u>, 181 Ill. 2d at 205, 692 N.E.2d at 302.

In construing a statute, a court's primary role is to determine and give effect to the intent of the legislature. <u>Town & Country Utilities, Inc. v. Illinois Pollution Control Board</u>, 225 Ill. 2d 103, 117, 866 N.E.2d 227, 235 (2007). The most reliable indicator of that intent is the plain language of

the statute. Town & Country Utilities, Inc., 225 Ill. 2d at 117, 866 N.E.2d at 235. "When the language of a statute is clear and unambiguous, a court must give effect to the plain and ordinary meaning of the language without resort to other tools of statutory construction." Quad Cities Open, Inc. v. City of Silvis, 208 Ill. 2d 498, 508, 804 N.E. 2d 499, 505 (2004). A court will not depart from the plain language of a statute by reading into it exceptions or conditions that the legislature did not express. Town & Country Utilities, Inc., 225 Ill. 2d at 117, 866 N.E.2d at 235.

The statute in dispute in this issue, section 39.2(e) of the Act, provides as follows:

"Decisions of the county board or governing body of the municipality are to be in writing, specifying the reasons for the decision, such reasons to be in conformance with subsection (a) of this Section. In granting approval for a site the county board or governing body of the municipality may impose such conditions as may be reasonable and necessary to accomplish the purposes of this Section and as are not inconsistent with regulations promulgated by the Board. Such decision shall be available for public inspection at the office of the county board or governing body of the municipality and may be copied upon payment of the actual cost of reproduction. If there is no final action by the county board or governing body of the municipality within 180 days after the date on which it received the request for site approval, the applicant may deem the request approved." 415 ILCS 5/39.2(e) (West 2006).

As written, the statute imposes two requirements upon the local siting authority. The local siting authority must take final action upon the application (the final action requirement) and must issue a written decision (the written decision requirement) specifying the reasons for its ruling. 415 ILCS 5/39.2(e) (West 2006). In addition, the statute imposes a 180-day time limitation upon the

16

local siting authority. 415 ILCS 5/39.2(e) (West 2006). We must determine whether the 180-day time limitation applies to only the final action requirement or to both the final action requirement and the written decision requirement. In making that determination, we must also consider what effect, if any, Title 35, section 107.204, of the Illinois Administrative Code (the Code) has upon our interpretation of section 39.2(e) of the Act. Section 107.204 addresses the time requirement for filing a petition for review with the Illinois Pollution Control Board and provides:

"A petition for review must be filed within 35 days after the local siting authority's action to approve or disapprove siting. Action means the local government's official written decision granting or denying local siting approval. Pursuant to Section 39.2(e) of the Act, action includes failure of the governing body to act within 180 days after receiving a request for siting approval." 35 Ill. Adm. Code §107.204.

By our view, the statutory language of section 39.2(e) is clear and unambiguous. It requires only that the local siting authority take final action on the application within 180 days; it does not require that the local siting authority's written decision memorializing that final action be issued within 180 days. We reach that conclusion based upon the organization and plain language of the statute. The 180-day time limitation is placed in the same sentence as the final action requirement and, thus, references that requirement. The written decision requirement is placed earlier in the paragraph and is separated from the final action requirement by two additional sentences. There is nothing about the organization of the statute or about its plain language that would lead us to conclude that the 180-day time limitation was meant to apply to the written decision requirement as well. That the legislature chose to use two distinct terms in the statute, "action" and "decisions," is a further indication that the legislature intended those two terms to have different meanings. See

17

Waste Management of Illinois, Inc. v. Illinois Pollution Control Board, 145 Ill. 2d 345, 348-52, 585 N.E.2d 606, 607-09 (1991) (supreme court recognized a distinction between the 120-day "final action" requirement contained in section 40.1 of the Act and the "written opinion" requirement contained in section 33(a) of the Act). We will not read a condition into section 39.2(e) that the legislature did not express. See Town & Country Utilities, Inc., 225 Ill. 2d at 117, 866 N.E.2d at 235.

A reading of section 107.204 of Title 35 of the Code does not change our interpretation of section 39.2(e). Section 107.204 defines "action" only as referenced in section 107.204 and only for the purpose of filing for review with the PCB. Section 107.204 does not define "action" as the term is used in section 39.2(e) and does not, when read in conjunction with 39.2(e), convince this court that the 180-day time limitation contained in section 39.2(e) applies to the written decision requirement.

Having determined that section 39.2(e) of the Act only requires the local governmental authority to take final action within 180 days, not to issue its written decision within 180 days, we must determine whether those requirements were satisfied in the present case. As to the final-action requirement, contrary to the company's argument, it is clear from the record that the county board denied the company's application at the May 3 county board meeting. The procedure that the county board was following at the meeting is clearly set forth in the record. The county board was advised by letter prior to the meeting and orally at the meeting itself that a vote against the motion to approve the application would be a vote against the application and that a separate, second vote to deny the application would not be necessary. The company's attorneys were present when the manner of proceeding was stated for the record and did not object to the form of the vote. Regardless of whether a November 9, 2005, or a November 14, 2005, starting date is used, the county board took

18

final action within the 180-day period when it voted against the application at the May 3 meeting. We need not determine, therefore, whether it was proper for the county to delay the filing of the application for a short period so that the county clerk could verify that the application was administratively complete.

As to the written-decision requirement, based on the record before us, we must conclude that the county board satisfied that requirement as well. In reaching that conclusion, we note that the statute does not define the form that the local siting authority's written decision must take and we will not read such a condition into the statute. Town & Country Utilities, Inc., 225 Ill. 2d at 117, 866 N.E.2d at 235. The county board adopted a written set of facts in support of its decision and agreed to allow a transcript of the meeting to serve as a written record of what had occurred. The unofficial version of that transcript was posted on the county's web site a short time later. All of that was sufficient to satisfy the written-decision requirement.

As its next point of contention on appeal, the company argues that the PCB erred in finding that the county board proceedings were fundamentally fair. Specifically, the company asserts that: (1) two of the county board members, Mr. Mayer and Mr. Thomas, were biased against the application and should have been disqualified because at the time of the siting proceedings, they were members of the Sierra Club, one of the opposition groups involved in the proceedings; (2) a third county board member, Mr. Elsasser, was biased and should have been disqualified because he predetermined the matters at issue before the county board; and (3) the county board members received improper, prejudicial ex parte communication on the matter, which influenced their decision to vote against the application.

The PCB and the county argue that the company received a fundamentally fair proceeding and that the PCB's ruling on this matter should be affirmed. In response to the company's specific

19

assertions, the PCB and the county contend that the company has forfeited any claim of bias by failing to raise the claim in the original siting proceedings; that even if the claim of bias is not forfeited, the record before this court shows that the board members in question were not biased and did not prejudge the matter; and that even if the board members received ex parte communications related to the siting proceeding, the company was not prejudiced by those communications.

As with the first issue, the parties disagree on the standard of review. The company argues that because none of the relevant facts are in dispute, a de novo standard of review is appropriate. See Waste Management of Illinois, Inc., 356 Ill. App. 3d at 232, 826 N.E.2d at 589. The county takes no position on the standard of review. The PCB argues that a clearly erroneous standard of review is appropriate since this issue raises a mixed question of law and fact. See AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380, 392, 763 N.E.2d 272, 280 (2001). In making that argument, the PCB recognizes that this court previously held in Land & Lakes Co. v. Pollution Control Board, 319 Ill. App. 3d 41, 48-49, 743 N.E.2d 188, 194 (2000), that a de novo standard of review should be applied to the issue of fundamental fairness. The PCB asks this court to overrule that holding and to return to the controlling precedent established by our supreme court.

Having considered this matter again, we conclude that the PCB is correct. Regardless of the reasoning behind our decision in Land & Lakes Co. to apply a de novo standard of review to the fundamental fairness determination, we are bound by the supreme court and must follow its rulings. Angelini v. Snow, 58 Ill. App. 3d 116, 119, 374 N.E.2d 215, 217 (1978). This is a mixed question of law and fact (see Land & Lakes Co., 319 Ill. App. 3d at 48-49, 743 N.E.2d at 194), and we are required by supreme court precedent to apply a clearly erroneous standard of review. See AFM Messenger Service, Inc., 198 Ill. 2d at 392, 763 N.E.2d at 280; Cinkus v. Village of Stickney

20

Municipal Officers Electoral Board, 228 Ill. 2d 200, 211-12, 886 N.E.2d 1011, 1018-19 (2008). We must follow and apply the clearly erroneous standard until the supreme court rules otherwise. See Angelini, 58 Ill. App. 3d at 119, 374 N.E.2d at 217. Therefore, we overrule that portion of the Land & Lakes decision regarding the standard of review to be applied to the issue of fundamental fairness. Applying the clearly erroneous standard in this case, we will not overturn the PCB's ruling on fundamental fairness, unless after a review of the entire record, we are left with the definite and firm conviction that a mistake has been committed. See AFM Messenger Service, Inc., 198 Ill. 2d at 395, 763 N.E.2d at 282; Cinkus, 228 Ill. 2d at 211-12, 886 N.E.2d at 1018-19. Having determined the appropriate standard of review, we now consider the law on this issue.

In reviewing a local siting authority's decision, the PCB is to consider, among other things, the fundamental fairness of the proceedings. 415 ILCS 5/40.1(a) (West 2006); Land & Lakes Co., 319 Ill. App. 3d at 47-48, 743 N.E.2d at 193. In a local siting proceeding, fundamental fairness incorporates only the minimal standards of procedural due process, such as the right to be heard, the right to cross examine adverse witnesses, and the right to have impartial rulings on the evidence. Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 95, 606 N.E.2d 1111, 1120 (1992); Land & Lakes Co., 319 Ill. App. 3d at 48, 743 N.E.2d at 193. The members of a local siting authority are presumed to have made their decision in a fair and objective manner. See E & E Hauling, Inc. v. Pollution Control Board, 107 Ill. 2d 33, 42, 481 N.E.2d 664, 667-68 (1985); Waste Management of Illinois, Inc. v. Pollution Control Board, 175 Ill. App. 3d 1023, 1040, 530 N.E.2d 682, 695 (1988). That presumption is not overcome merely because a member of the authority has previously taken a public position or expressed strong views on a related issue. See 415 ILCS 5/39.2(d) (West 2006); Waste Management of Illinois, Inc., 175 Ill. App. 3d at 1040, 530 N.E.2d at 695. Rather, to show bias or prejudice in a siting proceeding, the complainant must show

21

that a disinterested observer might conclude that the local siting authority, or its members, had prejudged the facts or law of the case. Waste Management of Illinois, Inc., 175 Ill. App. 3d at 1040, 530 N.E.2d at 696. In addition, issues of bias or prejudice on the part of the local siting authority are generally considered forfeited unless they are raised promptly in the original siting proceeding because it would be improper to allow the complainant to knowingly withhold such a claim and to raise it after obtaining an unfavorable ruling. E & E Hauling, Inc.,107 Ill. 2d at 38-39, 481 N.E.2d at 666.

Because of the nature of siting proceedings, courts have long recognized that it is inevitable that some ex parte communication will occur between the public and the members of the local siting authority. Southwest Energy Corp. v. Pollution Control Board, 275 Ill. App. 3d 84, 92, 655 N.E.2d 304, 310 (1995). That recognition comes from an understanding of the realities of the situation–that members of the local siting authority are not judges but, rather, locally elected officeholders on municipal or county boards. Southwest Energy Corp., 275 Ill. App. 3d 84, 92, 655 N.E.2d 304, 309 (1995). As such, they are constantly bombarded with the concerns of their constituents. The public may not be aware of or understand that in a local siting proceeding, their elected representatives are acting in an adjudicatory role and that ex parte communication, therefore, is improper. See Waste Management of Illinois, Inc., 175 Ill. App. 3d at 1043, 530 N.E.2d at 698. A reviewing court will not reverse an administrative agency's decision because members of the agency have received improper ex parte communications without a showing that the complaining party suffered prejudice as result of those communications. Waste Management of Illinois, Inc., 175 Ill. App. 3d at 1043, 530 N.E.2d at 697. Mere expressions of public sentiment are not sufficient for a showing of prejudice. See Waste Management of Illinois, Inc., 175 Ill. App. at 1043, 530 N.E.2d at 697. Nor does the existence of strong public opposition render the proceedings fundamentally unfair, as long

22

as the applicant is provided with a full and complete opportunity to present evidence in support of its application. Waste Management of Illinois, Inc., 175 Ill. App. at 1043, 530 N.E.2d at 697-98.

Turning to the specific arguments raised by the company on this issue, we find that the PCB's determination that the proceedings were fundamentally fair is not clearly erroneous and must be affirmed. In reaching that conclusion, we note that any claim that board members Mayer, Thomas, and Elsasser were biased against the application, has been forfeited. See E & E Hauling, Inc.,107 Ill. 2d at 38-39, 481 N.E.2d at 666. The company was aware of the grounds for making a claim of bias against the board members before the county board voted on the application at the May 3 meeting. The company learned at the meeting itself, before a vote was taken, that Mayer and Thomas were members of the national Sierra Club. The company's attorneys could have objected and raised a claim of bias at that point, before a vote was taken. In addition, the comments which would allegedly give rise to a claim of bias against Elsasser were made at the April 6 site committee meeting. The company has forfeited its claim of bias and will not be allowed to raise that claim now after an unfavorable ruling has been obtained. See E & E Hauling, Inc.,107 Ill. 2d at 38-39, 481 N.E.2d at 666.

Even if we were to reach the merits of the company's claim of bias, we would have to find on this record that the PCB's ruling is not clearly erroneous. The company has failed to overcome the presumption that the board members acted in a fair and impartial manner. When questioned about their Sierra Club membership, Mayer and Thomas both responded that they had never even attended a local meeting and that there was nothing about their membership that would prevent them from being fair and impartial in the siting proceeding. In addition, although Elsasser commented about his personal experiences, there is nothing about those comments that would give rise to a determination that he had prejudged the issues before the county board in the local siting proceeding.

23

We are also not persuaded by the company's claim that it was deprived of a fair proceeding because of ex parte contacts. The contacts that occurred in this case, although improper, were little more than an expression of public sentiment and were duplicative of the public comment that was properly made part of the record. The county board members were informed numerous times that they had to base their decision on the evidence and the record indicates that they did that to the best of their abilities. The company was provided with a full and complete opportunity to present evidence and to support its application. We cannot say, therefore, that the PCB's determination on this issue was clearly erroneous. See Waste Management of Illinois, Inc., 175 Ill. App. 3d at 1043, 530 N.E.2d at 697-98. We note as well, however, that even if we had applied a de novo standard of review to this issue, as the company had requested, we would have reached the same conclusion.

As its final point of contention on appeal, the company argues that the PCB erred in finding that the company had failed to satisfy the statutory siting criteria. Specifically, the company asserts that the PCB's determination that the company had failed to satisfy criteria (i), (ii), (iii), and (v) is against the manifest weight of the evidence. The PCB and the county argue that the PCB's findings are supported by the evidence and should be affirmed.

On appeal from the PCB's ruling in a siting proceeding, the appellate court is to review the decision of the PCB, not the decision of the local siting authority. Town & Country Utilities, Inc., 225 Ill. 2d at 118-21, 866 N.E.2d at 235-37. The PCB's decision on the statutory siting criteria will not be reversed on appeal unless it is against the manifest weight of the evidence. See Town & Country Utilities, Inc., 225 Ill. 2d at 123, 866 N.E.2d at 238. For reversal to be warranted, it must be clearly evident from the record that the PCB should have reached the opposite conclusion. See Abrahamson, 153 Ill. 2d at 88, 606 N.E.2d at 1117. That the opposite conclusion is reasonable or

24

that the reviewing court might have ruled differently if it were the trier of fact is not enough to justify a reversal. Abrahamson, 153 Ill. 2d at 88, 606 N.E.2d at 1117.

Initially, we must address the company's assertion that the PCB erred when it reviewed the county board's decision to determine if that decision was against the manifest weight of the evidence. The company contends that the supreme court's ruling in the Town & Country case, cited above, changed the standard of review that the PCB is to apply and requires the PCB to conduct a de novo review of the county board's decision while applying its own technical expertise to the evidence gathered in the local proceedings. We do not agree with that conclusion. The established standard is for the PCB to review the local siting authority's decision on the statutory criteria to determine if that decision is against the manifest weight of the evidence. See Waste Management of Illinois, Inc. v. Pollution Control Board, 123 Ill. App. 3d 1075, 1083, 463 N.E.2d 969, 976 (1984); McLean County Disposal, Inc. v. County of McLean, 207 Ill. App. 3d 477, 480, 566 N.E.2d 26, 28 (1991). Town & Country does not change that standard. In fact, Town & Country does not even address that issue. We, therefore, reject the company's assertion on this point.

We also reject the company's assertion that the PCB's ruling on the statutory criteria was against the manifest weight of the evidence. As to criteria (i), (ii), and (iii), there was sufficient evidence presented in the record to support the PCB's ruling. On criterion (i), although Sheryl Smith testified that the proposed expansion would accommodate the needs of the service area, there were some potential flaws in her analysis, most notably, her use of a static model and her failure to consider declining rates of waste generation. On criterion (ii), conflicting expert testimony was presented regarding the safety of the proposed expansion, especially as it related to the geology and hydrogeology of the site and the possible effects of the proposed expansion on water quality. On

25

criterion (iii), although Chris Lannert testified that the proposed expansion would not be incompatible with the surrounding area, that testimony had to be reconciled with other parts of his testimony where he acknowledged that the vertical expansion would be visible to nearby residences and that it would consist of a dirt project for the 15-year lifespan of the operation. It is the administrative agency's role in such a proceeding to decide what weight to give to the evidence presented and to resolve any conflicts in the evidence. City of Belvidere, 181 Ill. 2d at 205, 692 N.E.2d at 302. On review, our role as to factual issues is limited–we may not reweigh the evidence or substitute our judgment for that of the administrative agency. See City of Belvidere, 181 Ill. 2d at 205, 692 N.E.2d at 302. The question in this appeal is not whether a ruling in favor of the company is a more reasonable conclusion based upon the evidence presented. See Abrahamson, 153 Ill. 2d at 88, 606 N.E.2d at 1117. Rather, the only question is whether it is clearly evident from the record that the PCB should have ruled in the company's favor. Based on this record, we do not draw that conclusion. See Abrahamson, 153 Ill. 2d at 88, 606 N.E.2d at 1117. We find, therefore, that the PCB's ruling as to criteria (i), (ii), and (iii) is not against the manifest weight of the evidence.

As to criterion (v), the company itself proposed that a perpetual care fund condition be added to criterion v and cannot now object to the implementation of that condition. See McMath v. Katholi, 191 Ill. 2d 251, 255, 730 N.E.2d 1, 3 (2000) (a party cannot complain about an error that it induced the court to make). In addition, there is ample evidence in the record to support the amount imposed. The condition was discussed at length in the reports by county staff and at the April 6th site committee meeting. We conclude, therefore, that the PCB's ruling on criterion v is not against the manifest weight of the evidence. We also reject the company's argument that pursuant to County of Lake v. Pollution Control Board, 120 Ill. App. 3d 89, 101, 457 N.E.2d 1309, 1317 (1983), such a condition may not legally be imposed on the company. Although the court in

26

County of Lake found that section 39.2 of the Act does not grant the local siting authority the power to assess fees against the applicant (County of Lake, 120 Ill. App. 3d at 101, 457 N.E.2d at 1317), that rule does not prevent the local siting authority from doing so in case such as this, where the applicant proposes that a fee be assessed against it as a condition of approval. See McMath, 191 Ill. 2d at 255, 730 N.E.2d at 3.

For the foregoing reasons, the decision of the Illinois Pollution Control Board is confirmed.

Confirmed.

O'BRIEN and WRIGHT, J. J. concurring.